PRUDENTIAL TRUST COMPANY *vs.* R. SHERMAN McCARTER
& others.

Suffolk. May 24, 1929. — April 3, 1930.

Present: RUGG, C.J., CROSBY, SANDERSON, & FIELD, JJ.

*Trust Company*, Officers and agents: director's duties and liability. *Equity Pleading and Practice*, Master: report, findings. *Interest*.

Statement in general terms by RUGG, C.J., of the standard of duties for directors of a Massachusetts trust company with both commercial and savings departments.

Ordinarily, in a suit in equity by a Massachusetts trust company having both commercial and savings departments against a director to recover losses alleged to have been caused by failure of the defendant to perform his duties as a director, the question, whether the defendant has conformed to the standard of duty set for such a director in this Commonwealth, is one of fact.

In such a suit, proof of a breach of his duty by the defendant must be by proof of failure to exercise ordinary care and prudence in managing the affairs of the bank, and the burden of proving such breach is on the plaintiff, notwithstanding the heavy fiduciary obligation resting on the defendant as a director.

Findings of fact by a master, to whom was referred a suit in equity, in a report which included only a small part of the evidence and did not set out all the subsidiary facts and circumstances upon which his general conclusions rested, must be accepted as true unless they are mutually inconsistent or contradictory and plainly wrong.

Upon a reservation of a suit in equity for determination by this court upon the pleadings and the report of a master which contained only a small part of the evidence and did not include all the subsidiary facts and circumstances upon which the master's general conclusions rested, this court has the power and, if the circumstances require, has the duty to make additional or different findings of fact by inference from the facts reported by the master.

A master, to whom was referred a suit by a Massachusetts trust company having both commercial and savings departments against certain of its directors to enforce liability for neglect of duty in permitting improvident and unwarranted loans, found that such loans had been made by officers of the plaintiff and had resulted in losses; that the defendants had received explanations and information from the executive officers which were satisfactory and had acted in good faith; that over a series of years while such loans were being made the bank commissioner, following annual audits by his experts, had made reports to the plaintiff, of which the defendants had knowledge,

containing several and detailed criticisms of the conduct of the plaintiff's affairs in impairment of its capital, excessive loans to borrowers unworthy of credit and in their nature uncollectible, and reckless and careless methods of the president and the treasurer in conducting the affairs of the plaintiff; that, with that information at hand, the defendants were charged "with knowledge of the true condition of the bank and the extent to which its capital had become impaired by reason of its money to such a large degree being invested in loans which to such a large amount were uncollectible in whole or in part." He further found that the executive officers of the plaintiff so explained matters to the defendants and gave them assurance that matters were arranged to the satisfaction of the bank commissioner that in all the circumstances the defendants were not negligent as to many of the loans. Upon reservation of the suit for determination by this court, it was *held*, that

(1) The audits of the bank commissioner's disinterested experts specifically pointed to glaring mismanagement of the bank, which could have happened only through fault of executive officers of the bank, and, in the face of such specifications, the directors were not justified in failing to take effective action;

(2) The master's finding that the defendants were chargeable with knowledge and notice of the true condition of the bank from the bank commissioner's audit overcame his finding as to want of negligence in passing upon enumerated loans, if and so far as the two were inconsistent, and was controlling.

The master in the suit above described found that one of the defendants was elected a director in 1916, but did not take the oath of office till later; that in 1916 he attended one regular and one informal meeting of the directors and three meetings of the executive committee; that thereafter he attended three meetings of the executive committee in 1917, one in 1918, two in 1919; he attended one meeting of directors in 1917, three in 1918, five in 1919 and one in 1920; and that the bank was closed by the bank commissioner in September, 1920. The master found that he was a director from the time of his first attendance at a board meeting to the closing of the bank. *Held,* that the finding was warranted and could not be reversed.

The plaintiff in the suit above described was incorporated on June 1, 1915. The first audit by the bank commissioner covered the periods from the opening of the bank to January 20, 1917; the second, the next period to January 28, 1918; the third, the next period to February 15, 1919; and the fourth, of which only one defendant director knew, the next period to January 14, 1920. The first and second audits had been received and considered by May 18, 1918. The master's finding was in substance that the defendants by reason of the audits were chargeable with knowledge of the true condition of the bank from early in 1918. One of the defendants was elected a director in May, and took the oath of office in August, 1918. He also was elected a director in 1919 and 1920, but there was no record of his having been sworn as a director in those years. The only meetings he attended were on August 13 and December 10, 1918. The master found that he never

qualified as a director in 1919 and 1920, "never attended any meetings of the board or of the executive committee during those years, or in any way indicated acceptance of his election for those years, and during those years did not perform or attempt to perform any of the duties of that office. I find that he was not either *de jure* or *de facto* a director for these years." *Held*, that

(1) The master's finding that such defendant was not a director in 1919 and 1920 must stand;

(2) Although such director was not excepted from and therefore was included in the sweeping finding of the master as to being chargeable with knowledge of the true condition of the bank in 1918, there was nothing in the record to establish liability on his part for the losses sustained by the bank during his period of service as director, which covered about five months, except so far as he had been found negligent by the express terms of the report of the master.

Another defendant in the suit above described was elected a director in August, 1919, and took the oath of office in November, 1919, and he was elected again and qualified in 1920, thus serving during the last nine or ten months of the bank's active existence. During this period he attended but three meetings of the directors and one of the executive committee. No audit was presented to the directors during this period and he did not know of the fourth audit, which was known to but one defendant and not shown by him to other defendants. So far as appeared and so far as reasonable performance of his duties required, he did not know the contents of the first three audits, the last of which was sent to the bank about six months before he became a director. *Held*, that

(1) Such director did not become a director until he took the oath of office and in any event could be found liable only as to losses occurring after he became a director;

(2) There were no facts found tending to charge him with knowledge of the condition of the bank.

A resignation as director by one of the defendants in the suit above described after June 8, 1920, filed with the president but not presented to or acted upon by the directors, did not relieve him from liability.

The defendants in the suit above described stood in the relation of trustees toward the plaintiff and its depositors, and consequently the statute of limitations began to run against the plaintiff only from the time that it learned of the defendants' wrong doing.

In the circumstances disclosed in the suit above described, a contention of the plaintiff that the defendants were liable for losses and expenses of liquidation could not be supported.

Upon the record in the suit above described, it appeared that the first two audits had been received and considered by the directors by May 18, 1918; and this court allowed until July 1, 1918, as a reasonable time to permit the investigation which the directors then should have made.

The provisions of the statute respecting the investment committee of the savings department not having been observed and that com-

mittee not having functioned, as the directors ought to have known, the defendants were liable for losses in the plaintiff's savings department: for dividends wrongly paid, for losses on loans to any individuals in excess of the amount of the permissible percentage on the capital, for losses on overdrafts, and for losses on all loans improvidently made.

In the suit above described, it was *held*, that the defendants were chargeable with simple interest on all sums found due from them from the time the loss to the bank occurred.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on December 5, 1924, and afterwards amended, originally against twenty-five directors of the plaintiff, to enforce their liability as directors for losses alleged to have been caused by their failure properly to perform their duties.

Through decrees of dismissal and *pro confesso*, the number actually defending the suit was reduced to the following: R. Sherman McCarter, Edward W. Quinn, John F. Hayes, Charles D. Malaguti, Charles F. Stack, Benjamin F. Chamberlin, Harry W. Hatch and William Hennessy.

The suit was referred to a master "to hear the parties and their evidence, to find the facts, and report the same to the court." The rule afterwards was amended by directing the master "to report such portions of the verbatim testimony of any of the original defendants as either party may request," and to add to the report bank audits for 1917, 1918, 1919, and 1920.

The master's findings as to the defendant Edward W. Quinn were that he "was elected a director May 14, 1918, by election of the board, and was sworn on August 13, 1918, which was the first meeting which he attended. He was subsequently elected by the stockholders for 1919 and 1920. I find no record of his having been sworn as a director after his election in 1919 and 1920. The only meetings which he attended as a director were on August 13, 1918, and an adjourned meeting of December 10, 1918, at Young's Hotel, which however was a business meeting at which important business of the bank was transacted. He was never a regular or elected member of the executive committee, and although designated as a monthly member

for June and October, 1919, he never attended any meeting. I do not find that he was ever designated to serve as a monthly member at any other time. I find that this defendant never qualified as a director for the years 1919 and 1920, never attended any meetings of the board or of the executive committee during those years, or in any way indicated acceptance of his election for those years, and during those years did not perform or attempt to perform any of the duties of that office. I find that he was not either *de jure* or *de facto* a director for these years."

Other material facts found by the master are stated in the opinion.

The suit was reserved by *Crosby,* J., for determination by the full court.

*J. Hannigan & J. E. Hannigan,* for the plaintiff.

*R. G. Dodge,* (*H. S. Davis* with him,) for the defendant Hennessy.

*A. M. Beale,* (*P. E. Troy* with him,) for the defendants McCarter and others.

RUGG, C.J. This suit in equity is brought by the Prudential Trust Company (hereafter described as the bank), now in the possession of the commissioner of banks, to establish and enforce liability against the defendants for losses alleged to have been caused by their failure to perform the duties resting on them as directors of the bank. The bill has been dismissed as to two defendants, and there are covenants not to sue others of them.

The bill has been taken *pro confesso* as to still other defendants. The truth of the allegations of the bill thus is established as to such defendants. Those allegations are sufficient to impose liability on them. *McArthur* v. *Hood Rubber Co.* 221 Mass. 372, 374–375. *Boston Safe Deposit & Trust Co.* v. *Stratton,* 259 Mass. 465, 476–477. The master sets forth in his report the losses for which each is responsible. The precise amount of their liability may be determined by the single justice on the basis of these findings.

There were eight active defendants before the master. Three only of these have caused briefs to be filed and arguments to be made in their behalf in this court. This

group of eight directors will be described hereafter as defendants.

The standard of duty for directors of a trust company with both commercial and savings departments has been recently examined and stated in general terms. Directors are bound to exercise ordinary prudence and skill to care for and invest the money entrusted to the bank, in accordance with its charter and the governing statutes. They must be animated by the utmost good faith. They hold themselves out as having the superintendence and management of all the concerns of the bank. They thereby engage to conduct its business as men of reasonable ability, necessary intelligence and sound judgment ought to conduct it. They must be diligent in ascertaining and in keeping informed as to the condition of its affairs; they must to a reasonable extent control and supervise its executive officers and agents; they must display understanding and insight proportionate to the particular circumstances under which they act. They need not exhibit greater wisdom and foresight than may be fairly expected of the ordinary man in similar conditions. They invite the confidence of the depositing public and must afford the protection thereby implied. They are not bound to give continuous attention to the business of the bank; they are bound only to be present, so far as rationally practicable, at stated meetings of the board and of its committees. They are not required to be expert accountants or familiar with the details of bookkeeping or to know everything disclosed by the books of the bank. Having regard to the nature and extent of the affairs of the bank and the customs of banking, directors are justified in committing the conduct of the main business to officers and subordinates and, in the absence of grounds for distrust, to assume that such persons will be upright in the performance of their duties. They are entitled to rely upon the information and advice given them by executive officers whose probity and competency are not under just suspicion, but they cannot surrender to them the responsibilities resting on directors. They are liable for negligence in the performance of those responsibilities even though they have acted in good faith.

Impracticable obligations are not imposed on them.  But they must direct and not be led.  They must heed warnings from responsible sources.  They must do something to see that statutes established for the protection of depositors are observed and followed.  Each individual director is liable only for the results of his own misconduct although such results may be magnified in some instances by the concurring misconduct of other directors.  For errors of judgment while acting with integrity, "skill and prudence, measured according to the demands of the duties or business which they have taken upon themselves, they are not to be held liable; but they cannot excuse themselves from the consequences of their misconduct or of their ignorance or negligence by averring that they have failed merely to exercise ordinary skill, care and vigilance."  "In other words," such directors "are held to the same duty as ordinary trustees of a direct trust."  *Greenfield Savings Bank* v. *Abercrombie*, 211 Mass. 252, 256.  *Cosmopolitan Trust Co.* v. *Mitchell*, 242 Mass. 95, 118–121.  *Cunningham* v. *Commissioner of Banks*, 249 Mass. 401, 428–429.  In each of these decisions is a somewhat extended collection and review of relevant and supporting decisions, which need not be again cited.  See also *Prudential Trust Co.* v. *Moore*, 245 Mass. 311, 315; *In re City Equitable Fire Ins. Co. Ltd.* [1925] Ch. 407, 426–430; *Hallmark's Case*, 9 Ch. Div. 329; *Kimball* v. *Whitney*, 233 Mass. 321, 331–332.  These statements are necessarily somewhat general in terms.  Within the limitations thus established, each case must depend to a considerable extent upon its own facts.  Ordinarily, whether a director of a bank has conformed to this standard of duty in a given instance must be a question of fact.

In substance and effect the cause of action in the case at bar rests on the breach of duty arising from acceptance of the office of director.  It must be supported by proof of failure to exercise ordinary care and prudence in managing the affairs of the bank.  The burden of proof is on the plaintiff to establish misconduct of directors notwithstanding the heavy fiduciary obligation resting upon them.  This is the implication of our own decisions.  *Cunningham* v. *Com-*

*missioner of Banks, supra,* at page 429. *Commissioner of Banks in re Cosmopolitan Trust Co.* 249 Mass. 144, 147. *Cosmopolitan Trust Co.* v. *Mitchell, supra,* at page 122. See *Smith* v. *Smith,* 222 Mass. 102, 106. The point has been expressly decided in other jurisdictions. *Wallace* v. *Lincoln Savings Bank,* 89 Tenn. 630, 654, where the opinion was written by Judge Lurton. *Warner* v. *Penoyer,* 33 C. C. A. 222, 229. *In re City Equitable Fire Ins. Co. Ltd.* [1925] Ch. 407, 477.

The case was referred to a master under a rule which as amended required him to hear the parties and their evidence, to find the facts and report the same to the court together with such portions of the verbatim testimony of any of the defendants as either party might request and photostatic copies of the audits of the bank made by the commissioner of banks for 1917, 1918, 1919 and 1920. The report of the master is comprehensive and voluminous. Annexed to it are about fifty printed pages of excerpts from the testimony of some of the defendants. Manifestly only a small part of the evidence taken by the master is in the record. It is plain also that the master has not and was not required to set out in his report all the subsidiary facts and circumstances upon which his general conclusions rest. *Smith* v. *Lloyd,* 224 Mass. 173, 176. In these conditions, the findings of the master must be accepted as true unless they are mutually inconsistent or contradictory and plainly wrong. *Tripp* v. *National Shawmut Bank,* 263 Mass. 505, 511. The power and duty of this court to make additional or different findings of fact by inference from the facts reported by the master are settled. *American Circular Loom Co.* v. *Wilson,* 198 Mass. 182, 200. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 333–334. *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 253 Mass. 205, 214.

The facts relevant to the grounds of this decision as displayed in the master's report may be summarized. The bank was organized and started business in Boston on June 1, 1915. From the beginning it had both commercial and savings departments. It began business with a capital of $200,000 and a surplus of $50,000. No change in its author-

ized capital was ever made. It carried on business until September 10, 1920, when its banking rooms were closed and its business and assets taken by the commissioner of banks under St. 1910, c. 399, now G. L. c. 167. It has done no business since that date and its affairs and business have been and are yet in the hands of the commissioner of banks and are being liquidated.

The bank adopted by-laws whereby it was provided that there should be a board of directors of not less than seven nor more than fifty, such board as a whole or by committees to have the general management, control and direction of all the business and affairs of the bank. The number of directors varied from twenty-four to thirty-five during the period of its operation. Monthly meetings of the directors were required and were held, with occasional additional special meetings. The by-laws also provided for an executive committee to consist of the president and first vice-president, five directors to be elected annually, and four other directors to be designated monthly by the president in alphabetical order to serve for that month only. The executive committee was required to hold weekly meetings and was given power, when the board of directors was not in session, to transact all business for and in behalf of the bank. The master found that none of the active defendants before him were regular or elected members of the executive committee, although they were designated and served at times as monthly members.

The president of the bank had had but slight experience in banking, although favorably known in business and reputed to be a man of large means. He owned a substantial part of the capital stock of the bank. From the early part of 1917 he devoted practically all his time to the bank. The treasurer had had a twelve-years' experience in banking before entering the employment of the bank, the latter part of which was as assistant to the chief executive officer of a national bank in Boston. His reputation for trustworthiness and banking ability was high and the other officers and directors placed the greatest confidence in him until about five months before the bank was closed. None of

the "directors prior to their connection with this bank had much of any banking experience, but were for the most part business men, with a sprinkling of professional men." There was some variation in the regularity of attendance by the defendants at meetings of directors and committees. The defendants, with exceptions immaterial to the issues here to be decided, were reasonably diligent in their attendance at meetings and gave more than slight or perfunctory attention to their duties. At meetings of the board and of the executive committee the affairs of the bank were discussed, considered and acted upon. In the main the defendants relied upon reports and information given by the officers of the bank and were "not ignorant of the affairs of the bank in general" although some were ignorant of parts and others of other parts of its affairs. Many of the directors were ignorant of some of the statutes governing the conduct of the bank, but they "exercised their business judgment on all matters submitted to them fully, honestly and in good faith." Those who were elected members of the executive committee naturally had more knowledge of the affairs of the bank and the details of its business than those who served only periodically on that committee; those who were not such elected members relied to a large extent upon those who were, and trusted and depended upon their greater familiarity with the affairs of the bank. At the meetings of the board of directors and of the executive committee, information asked for was given by the officers and questions were asked by any director when the reports and information given did not afford all the facts thought to be necessary to enable him to act on the matter pending. The executive officers, being the president, the treasurer and the first vice-president, were empowered by vote of the executive committee, passed pursuant to authority conferred by a by-law, to make loans in an amount not to exceed $20,000 against commercial collaterals satisfactory to them, when such collaterals were in the form of bills of sale or warheouse receipts, and also to make loans or establish credit lines in an amount not exceeding $2,000 against promissory notes with or with-

out indorsements; this latter amount was subsequently raised to $2,500 and later to $7,500. The vice-president severed his connection with the bank in January, 1917, and thereafter there were but two executive officers. At each meeting of the executive committee the loans and discounts proposed were read from a discount book and approval of the same was commonly voted. With rare exceptions, and these in the early history of the bank, the loans and discounts which were so read at the meetings of the executive committee were loans where the borrowers had already received the amount of the loans from the bank in money or credit. This is true of all of the loans involved in the bill. In other words, instead of the executive committee passing upon each loan and the credit, standing and responsibility of the borrower or the value of the collateral offered, before the loan was made, this was done in the first instance by the president and the treasurer and the loan was made if it met with their approval after such investigation as satisfied them. Then, after the loan was made, it was submitted to the executive committee for its approval, with a report of the investigation made and the recommendation of the officers. This practice was known to, and acquiesced in by, all of the directors.

All the loans set forth in the bill were approved and put through by the president and the treasurer in the first instance and later approved by the executive committee. All the defendants knew, acquiesced in and approved of this course. It was customary in banks of the size of this bank for the president, or other authorized executive officer, to pass on loans in the first instance and report on the loans made by him, with all relevant information, to the executive committee, upon which that committee would vote approval or disapproval; and it was customary to rely upon the officer thus authorized, it not being practicable for the executive committee personally to make investigation concerning each loan. The master specifically finds that the defendants were not negligent in relying upon the investigations and reports made to them by their executive officers as to the credit,

standing and status of the borrowers. If upon the reports made to them by their officers the loan appeared to the defendants to be a good loan, they were not negligent in approving it, unless they had knowledge about it inconsistent with or contrary to that reported to them or unless for any reason they knew or should have known that the reports so given to them were not to be relied upon. The customary procedure at meetings of the directors after July 8, 1919, but apparently not before that date, was to approve the records of the executive committee and the latter's approval of loans as there recorded.

All the information called for by the directors was furnished them by the officers of the bank and the directors did not act without having before them all the knowledge considered by them essential to the action to be taken.

The master makes detailed findings as to each of the defendants concerning his attendance at meetings of the directors and of the executive committee while designated as a member of it. These need not be narrated because in our view liability does not turn upon them. Conduct of directors in this connection is to be considered with other findings on which liability is predicated. None of these defendants ever served upon the investment committee of the savings department.

The master has made careful analyses and findings as to each of the loans alleged in the bill to have resulted in loss to the bank and to have been negligently made, and has traced the relation of each defendant with them. His conclusion is stated in connection with the discussion of each loan. There are very few of these loans in the commercial department in respect to which in whole or in part he finds negligence by some of the directors. As to another group, he finds that the loans were improvident when made but either expressly or by implication that no one of the defendants has been proved to have been negligent touching them.

There are a few loans in issue in the savings department. As to one, or one group, he finds that, unless the failure of the investment committee to approve the loan from the savings department is sufficient to charge the defendants

with liability, there was no negligence on their part with reference to such loan. As to another he finds that the loans were improvident above a specified amount and that whoever participated in the excessive credit was negligent. Loans to still another borrower were improvident and not adequately secured. As to the balance of the loans set forth in the bill, being much the larger part of them, the finding is categorical that no one of the defendants was negligent, although numerous loans are found to have been improvident when made. It would serve no useful purpose to examine these loans in detail. Two lines of credit were especially disastrous to the bank, are much relied on by the plaintiff, and may be briefly discussed. The first may be designated as the Brown group, being made up of loans to Brown personally and to other persons and corporations controlled by him, but in effect all made to Brown. The dealings of the bank with this group were numerous and complicated and involved original loans totalling more than $329,000. There was due from this group to the bank when it closed $154,085, upon which claim is made in this bill. The master finds that these loans were in effect to one person, and that there was no evidence that they were split up at the instigation of or upon any understanding with executive officers of the bank to avoid provisions of the statutes as to excessive loans to one person, although they must have realized that such was the effect of these transactions. As any loans came before the directors, they would appear to be to separate and distinct persons. There was no evidence that the executive officers gave the directors, or that they had, any information to put them on their guard on this point, except that in the audit of 1918 the loans were grouped together and stated to be in excess of the permissible limit. At that time substantially all these loans had been made. After setting out all his findings in much detail as to each of these loans, the master concludes in these words: "The bank's loans to this Brown group constituted the largest total to any single borrower, yet a director using reasonable precautions, attending meetings both of the board and of the executive committee with fair regularity,

might not be aware of the extent thereof and of the character of the same, without independent investigation and examination of the bank's books. . . . I find that in fact, with the exceptions already noted, [as to whom there are express findings of no negligence] the defending directors did not know of the extent and nature of these loans, did not know that they were in reality a loan to a single borrower, in excess of the statute limitations, and that they were inadequately secured. I find that they did have knowledge that certain loans had been made to different borrowers in the Brown group, but not to the extent of the actual loans, and as to such that they had knowledge of, they relied upon and believed the representations to them by the executive officers, and by the acts of the executive committee which approved, that the same were adequately secured and were good loans. I find that the defending directors in relying upon their executive officers and the executive committee were not negligent." The Boston Dredging Company was a large borrower from the bank beginning with May, 1919. About a year later it owed the bank on loans and overdrafts $158,518.22. A few months afterwards it went into bankruptcy. All of these ought never to have been made with the exception of an early line of credit granted by the directors. These excessive credits were allowed by the treasurer in some instances with, and in some without, the knowledge of the president. After a detailed examination of these credits the master finds that the defending directors did not know of these excessive credits until after the bank was closed and were not negligent in not knowing the real situation touching these loans and overdrafts. In May, 1920, each of ten of the directors, including one defendant, gave a note to the bank for $12,500 to reduce this loan, but the others knew nothing of this transaction until long after. While this transaction bettered the situation of the bank, some of the directors were not worthy of loans of that amount and with a single exception comparatively small sums have been paid on these notes.

The directors made no inspection of the books of the bank. The only examinations of the books of the bank were made

by the bank commissioner at the request of a committee of the directors at the annual examinations and audits. There were four of these, the first covering the period from the opening of the bank to January 20, 1917; the second from January 22, 1917, to January 28, 1918; the third from the last date until February 15, 1919; and the fourth from that date until January 14, 1920.

All the audits made by the commissioner of banks contain somewhat severe criticisms of the conduct of the business of the bank. The master has grouped those criticisms in the first audit under twenty-one headings. These criticisms in the first audit need not be described further than to say that there was this statement: the "condition which has existed in the loan department has been one of extreme carelessness, and is not to be found in any other institution which comes under the supervision of this department"; and that the concluding criticism is: "It is apparent that the company is conducting its business in an unsafe and unauthorized manner, and unless these practices are discontinued at once, the Bank Commissioner will take action under Section 8, Chapter 590, Acts of 1908." The treasurer of the bank explained this audit to the directors. Thereafter he made reply in detail to the commissioner of banks, which the master finds was substantially correct and was so accepted by the bank commissioner's department. In the second audit numerous comments and criticisms of the books of the bank and its loans, and suggestions and directions as to certain changes, were made. The master groups these under twenty-six headings. Among other matters it was said that the officers of the bank were loaning too much on "slow and doubtful collaterals" and there were specifications including a large amount in second mortgages on real estate. They were requested to discontinue this practice and have a more liquid loan with collateral readily marketable at all times. The large lines extended to Harry B. Brown of $212,000 and to others were in excess of limits prescribed by the statute. This total to Brown was made up of the loans to the group which he controlled and was rightly described as made to him as a single party, although this was not known to the

defendants.   Attention also was directed to overdue loans, to large overdrafts, and to poor reserves.   It was said, also: "The lax method of keeping the loans, accounts, and records is considered by this department as unsafe banking" and the statute was again cited.   As to this audit the master says: "I find that the directors, although many of them did not familiarize themselves with the details of this audit and the reply thereto made in their behalf, as a whole and individually believed the representations made to them by their officers that the criticism[s] contained in the audit were met by correcting the things that were pointed out to be wrong and adopting the methods and procedure suggested in the audit, and relied upon and trusted their officers to do that. Those directors who were not members of the auditing committee and who were not officers of the bank, made no personal investigation of the bank's records, books and accounts to satisfy themselves individually of the correctness of the statements made to them by their officers and members of the auditing committee, but relied upon, believed and accepted the statements and explanation made to them by their officers and the examining committee.   I find that in substance, except as otherwise stated herein, that the statements made in the reply to the audit were correct, and whether correct or not all of the directors, who were not officers or members of the examining committee, believed these statements to be correct.   I also find that the reply made to the commissioner satisfied him that the corrections called for had been made, and the directors generally understood that he was satisfied with the statement made to him."

The third audit contained criticisms grouped by the master into fifteen divisions with several subdivisions.   Among these were the very large amounts of overdue and suspended paper, shortage of reserves and faulty bookkeeping.   This audit was read in full at a meeting of the board of directors held in June, 1919, and explained in detail by the treasurer. Notwithstanding this audit, a letter was sent to the bank by the deputy bank commissioner giving permission to pay a quarterly dividend on its stock of one and three fourths per cent as of July 1.   As to this audit the master finds:

"While no further formal action was taken by the directors with respect to this third audit, I am satisfied that some of the directors (I am unable to say which ones did and which did not) in a general way knew about the situation as reported to the bank commissioner by the treasurer, and the explanations offered to these directors by the president and treasurer were believed by them and satisfied them, without personal investigation on their part and they believed such explanations satisfied the bank commissioner, — especially as permission was given to pay dividends. The replies and statements given to the bank commissioner in connection with the third audit I find to have been substantially correct." The fourth audit was never submitted to the board of directors and was known to only one of the defendants, although it also contained somewhat severe strictures on the bank, its conduct and its assets.

The master finds respecting these audits in general and their effect upon the defendants as follows: "The foregoing audits and examinations were the only ones made of the bank during its operation. I have given the result of these examinations and audits in considerable detail, as well as the replies and explanations given by the bank's officers in answer to the comments and criticisms in these audits, as indicating the information and knowledge which the defendants had or could have obtained, and as showing the matters to which the attention of the officers and directors was directed. With the warnings given to them by these audits in the form of criticisms made by the bank commissioner of the bank's method of doing business, the character of its loans and securities, and the dangers arising therefrom, directors might well be expected to exercise greater caution and diligence and be more alert to avoid the pitfalls pointed out to them, than if such warnings were not given. In this connection, the assurances and explanations given by their officers must also be considered in determining the liability of the individual directors. Many of the criticisms contained in the audits were so answered and explained to the directors that such answers and explanations might reasonably be accepted by them. They

were assured by their officers that the explanations and answers were acceptable to the bank commissioner, and apparently they were so accepted by him or his department. All of this has a bearing upon each defendant's conduct. . . . The plaintiff has set out a schedule of losses sustained by the bank upon which the claim for recovery is based. So far as the negligence of any of the defendants contributed to the loss or losses claimed by the plaintiff, I have dealt with that subject under each particular loan scheduled, and in my findings there I have taken into account and given effect to the knowledge and notice which the defendants had or should have had in consequence of these audit reports."

The master has made elaborate tables showing the state of the reserve of the bank required by St. 1908, c. 520, §§ 8, 9, as amended by St. 1910, c. 377 (see St. 1914, c. 422), St. 1917, c. 283 and St. 1919, c. 82 (see now G. L. c. 172, §§ 73, 74), and has also shown the state of the reserve at the times of each of the challenged loans. It is enough to say that frequently and with increasing continuity as time went on the reserve was less than that required by law.

There is a further finding that, beginning at least as early as February 15, 1919, and from that time on, the assets of the bank taken at a fair valuation were not sufficient to have paid its liabilities in full. "If that constituted insolvency, then the bank was insolvent during that period. I find, however, that at no time from the beginning to the close was the bank unable to meet its obligations as they were presented to it, and at all times during that period it met its obligations to its depositors and other creditors as and when they arose. During this period the directors and the officers continued to invite and receive deposits, and to make loans, either in ignorance of the true condition, or with genuine hope and expectation that by continuance of the business losses could be overcome and made good, and eventually the bank once again become financially sound. This hope and expectation was not wholly without warrant, and I have no doubt that with the continuance of the bank as a going concern more might have been realized from certain loans

than could have been realized in the liquidation of a closed bank. The difference between the bank's real financial condition and its apparent condition as shown by its books was, to a large extent, dependent upon the value of its assets, and especially its loans. The value of these until actually realized upon was a matter of judgment and opinion. The bank's officers, and the directors, mainly relying upon the judgment and opinion of the officers, honestly believed that these assets were of greater value than actually was the case."

In connection with the conduct of the savings department, there is this finding: "Meetings of the investment committee were not held regularly. No meetings at all were held after May 27, 1919. This condition of affairs should have been known to the directors, and it was their duty to have remedied this condition when it was brought to their knowledge. Each of the annual audit reports (except the last) made by the bank commissioner's office for the bank, at the request of the stockholders' examining committee, in some form or other commented upon the failure of the investment committee to hold meetings and to properly perform their duties. Reasonable diligence on the part of the directors in the performance of their duty would have made them aware that the investment committee was not functioning properly."

As to certain losses in the savings department, the master says further: "Had the investment committee properly functioned, it is problematical whether the loans or all of them would have been made. To what extent the failure of the investment committee to perform its duties contributed to the losses which the bank sustained on these loans, I am unable to find as a fact, but report the facts found for the ruling of the court whether the defending directors are chargeable with the losses so sustained because of their failure to compel proper action by the investment committee."

As to the impairment of capital, the master finds that, "While I do not attempt to find the extent to which the capital was impaired at any particular date, I do find upon

all of the evidence that, beginning in February, 1917, the capital was impaired, and such impairment progressively grew worse until the close of the bank. I further find that while it would not be apparent from an examination of the bank's books, or from the daily statements of financial condition which were read to and approved by the defendants at meetings of the board and of the executive committee, and the defendants, with the exception of the defendant McNamee, were not in fact aware of this impairment of capital or the extent of the same, they should have known of it after the first two audits had been received and considered. The conditions reported by the bank commissioner should have put them upon inquiry as to the true state of affairs, and makes them chargeable with the knowledge which such inquiry would have disclosed. The statements of condition submitted to them by their officers, in the absence of information to the contrary, could have been relied upon by them and acted upon without negligence; but with information at hand from an independent and impartial source that things were not as they appeared on the surface, this to my mind charged them with the duty of further inquiry and investigation, and reliance upon the officers under those circumstances was not sufficient. I, therefore, find that the defendants are chargeable with knowledge of the true condition of the bank and the extent to which its capital had become impaired by reason of its money to such a large degree being invested in loans which to such a large amount were uncollectible in whole or in part."

These findings, and particularly the significant one last quoted, are abundantly justified by subsidiary findings and supporting facts set out in the report. Those findings mean that the defendants are chargeable with the knowledge which a searching inquiry by competent and disinterested bank experts in the early part of 1918 would have revealed. One of the facts which thus would have come to light is, as found by the master, impairment of the capital from February, 1917. Other such facts would have been the excessive loans to those unworthy of credit and loans in large part, if not wholly, uncollectible. Other facts which would have

been disclosed were the reckless and careless methods of the president and the treasurer in conducting the affairs of the bank. The attention of the directors was by these audits specifically pointed to glaring mismanagement of the bank, which could have happened only through fault of executive officers of the bank, or of the executive committee. In the face of such specifications of mismanagement from a disinterested public officer based upon thorough examination, the directors were not justified in failing to take effective action. With such knowledge thus presented and the further facts which would have been gained from causing a complete and detailed investigation, it would have been negligence beyond question for the directors to permit to continue the powers of the president and the treasurer in the same unsupervised and improvident manner as theretofore. If the directors were too busy or were otherwise unable to exercise efficient supervision, it was their plain duty to employ some trustworthy and competent person or persons to superintend and overlook the loans and investments and collaterals of the bank. The president confessedly was a man without banking experience. The circumstance that he was reputed to be wealthy was no guaranty that he would be an effective or even a tolerable bank president. No one of the directors had had any banking experience of consequence. Had a moderate degree of managerial capacity been manifested by the defendants, the last two years of the bank inevitably would have been different. For example, the excessive loans and overdrafts to the Boston Dredging Company would not have been made. Collateral, which according to the master's report vanished or was much diminished in value through inattention, would have been vigorously pressed for collection. Dividends on stock would not have been paid. Since the defendants have rightly been found "chargeable with knowledge of the true condition of the bank" from early in 1918, it is apparent that their ignorance or negligence contributed to some of the serious losses charged in the bill. For such ignorance or negligence the defendants cannot be excused. The disclosures of this record are not simply of general negligence unconnected with claims of losses alleged

in the bill.  As already pointed out, some of the losses so alleged and suffered by the bank after the early part of 1918 plainly would not have been sustained if there had been exercised reasonable capacity and care on the part of the defendants as directors.  If with the "knowledge of the true condition of the bank" and of its impaired capital they were unable to influence the other directors, chargeable also with like knowledge, to efficient action for the welfare of the bank, and desired to avoid further personal liability, they could have severed their connection with the bank.

The force and scope of this finding of the master, that the defendants are chargeable with knowledge of the true condition of the bank after the first two audits had been received and considered, are not effaced or dulled by the other finding already quoted in substance that, in passing upon the negligence of the defendants alleged in the bill as contributing to the specified losses claimed, he has dealt with the subject under each particular loan and in his findings has taken into account and given effect to the knowledge and notice which the defendants had or should have had in consequence of the audit reports.  He has in most instances found no negligence.  That finding we interpret to mean that effect was given to that knowledge and notice as bearing upon the conduct of the directors sitting on the board and passing upon each designated loan as it came up for approval or disapproval.  It relates to that narrow issue.  It does not take into account the responsibility and sharp obligation of the directors clothed with the power and burdened with the duty of general control and supervision of the bank and of all its affairs. It does not signify, according to our understanding, that effect was given to such knowledge and notice by considering the consequence to the welfare of the bank and the conduct of its business in the improved character of service and the more cautious judgment on the part of its executive officers which would necessarily have followed the exhibition on the part of the defendants of the genuine managerial force naturally to be engendered by such knowledge and notice in competent and careful directors.  If, however,

we are wrong in this interpretation, the finding that the defendants are chargeable with the knowledge and notice of the true condition of the bank from the early part of 1918 is the decisive one. It overcomes the finding as to want of negligence in passing upon enumerated loans, if and so far as the two are inconsistent, whatever may be the meaning of the latter finding. So far as it is matter of interpretation, we hold that the finding that the defendants are chargeable with knowledge of the true condition of the bank from early in 1918 is dominating and controlling. So far as it is matter of inference from all the facts in the master's report, we draw the conclusion from the report as a whole that that finding is dominating and controlling. It is confirmed by the description of the conduct of the business of the bank as disclosed by the tenor of the entire report of the master. We do this, having fully in mind the general principle stated early in this opinion and not hereby impaired in any degree, that the findings of the master, based on unreported evidence and the observation of witnesses, including twenty-one directors, in testifying, are accepted as true unless materially inconsistent or contradictory. We simply adopt as regnant the governing and paramount finding. That is the true construction of the report. If and so far as there is inconsistency with other findings, that is the finding which outweighs every other.

In addition to this general conclusion it is necessary to deal briefly with a few of the defendants individually. The finding of the master that the defendant Hennessy was a director from May 2, 1916, when as a member he first attended a meeting of the executive committee, to the closing of the bank, cannot be reversed and is supported by the facts reported. His failure to take the oath of office until a later date is not decisive against his being a director. In 1916 he attended one regular and one informal meeting of the directors and three meetings of the executive committee. Thereafter he attended three meetings of the executive committee in 1917, one in 1918, two in 1919; he attended one meeting of directors in 1917, three in 1918, five in 1919 and

one in 1920. Thus it appears that his record of attendance at meetings was not good. He visited the bank two or three times a month and talked with the president and the treasurer on such occasions as to its condition and progress and was assured that the bank was making progress and that the future looked bright. He also had occasional casual talks with some of the permanent members of the executive committee with similar results. There is nothing in these facts or elsewhere in the report to exonerate him from the sweep of the general findings already summarized and the conclusion reached. The defendant Edward W. Quinn was a director from August 13, 1918. He attended no meetings of the executive committee and only two meetings of the directors, one in August and one in December. At the latter meeting the first dividend on the stock of the bank was voted. The finding that he was not a director for the years 1919 and 1920 must stand. No facts other than those stated above are set forth tending to show dereliction of duty on his part as a director. Although he is not excepted from and is therefore included in the sweeping finding of the master as to being chargeable with knowledge of the true condition of the bank, there is nothing in the record to establish liability on his part for the losses sustained by the bank during his period of service as director, which covered about five months, except so far as he has been found negligent by the express terms of the report of the master. He was not a director when any audit by the commissioner of banks was received and considered, and cannot rightly be charged on the basis of knowledge of facts as to which no notice was given him. The defendant Chamberlin was elected a director in August, 1919, and took the oath of office in November, 1919. He was elected again and qualified in 1920, thus serving during the last nine or ten months of the bank's active existence. During this period he attended but three meetings of the directors and one of the executive committee. He did not become a director on the facts found until he took the oath of office. In any event he could be liable only as to losses occurring after he became a director. No facts are set out tending to charge him with

knowledge of the condition of the bank. No audit was presented to the directors during this period and he did not know of the fourth audit, which was known to but one defendant and not shown by him to other defendants. So far as appears and so far as reasonable performance of his duties required, he did not know the contents of the first three audits, the last of which was sent to the bank about six months before he became a director. The finding that the defendant McCarter was a director from June, 1915, to the closing of the bank was right. His resignation after June 8, 1920, filed with the president but not presented to or acted upon by the directors, did not relieve him. Both he and Hatch fall within the general conclusions already stated.

The findings of the master as to the negligence of Hatch, Hennessy and McCarter need not be analyzed in detail because it is manifest that they were too favorable to these defendants, and so far as adverse to them there is no reversible error or ground for their exoneration.

The statute of limitations is not a defence to any of these defendants. That is settled on the facts here disclosed by *Greenfield Savings Bank* v. *Abercrombie*, 211 Mass. 252, 259. We regard *Lippitt* v. *Ashley*, 89 Conn. 451, 476–479, and *Curtis* v. *Connly*, 257 U. S. 260, 263, not as in conflict, but as inapplicable to the facts of the case at bar.

In the circumstances here disclosed the contention of the plaintiff that the defendants are liable for losses and expenses of liquidation cannot be supported. The facts already narrated lead to that conclusion. On this point the case is governed by *Fuller* v. *Trustees of Deerfield Academy*, 252 Mass. 258, 264, and is distinguishable from *Stiles* v. *Municipal Council of Lowell*, 233 Mass. 174, 183. It is not necessary to discuss factors not here present which might establish such liability on the part of bank directors.

The result is that, in addition to matters concerning which the master has found the defendants negligent, they also are liable (save as hereinbefore noted as to E. W. Quinn and Chamberlin) for losses of several kinds alleged in the bill which occurred after the first two audits had been received and considered. That date is May 18, 1918. A reasonable

time ought to be allowed thereafter to permit investigation. We fix July 1, 1918, as that time.

As to losses alleged and specified in the bill, the defendants are liable for losses in the savings department. The provisions of the statute respecting the investment committee were not observed and that committee did not function, as the directors ought to have known. It cannot be assumed that losses in this department would not have been avoided if these evils had been remedied as they would have been by the exercise of reasonable diligence on the part of the directors. They are liable for dividends paid thereafter. It manifestly was negligent to pay dividends when the capital had been seriously impaired, when the reserves were deficient, and when the surplus and guaranty were adversely affected. They are liable for losses on loans to any individuals in excess of the amount of the permissible percentage on the capital. They are liable for losses on overdrafts. They are liable for losses on all loans improvidently made. Large loans to the Brown group appear to have been made before that date, and, as the master has found, without negligence on the part of the defendants. With respect to losses on these loans, the defendants are liable for increases made after that date and for such of the loans theretofore made as might have been collected or reduced in size by the exercise of reasonable business judgment in the handling and disposition of collateral. Upon the facts here disclosed and contentions here made the liability of the defendants will in no event exceed the amount necessary to liquidate the balance of the unpaid debts of the bank.

It may seem hard to these defendants to be held to this liability. The standard of due diligence and capacity on the part of directors and of liability for negligence has been thoroughly established. It is not so onerous that business men will be afraid to take office as directors. It is essential for the protection of the depositing public. To permit such laxity as is disclosed on this record to go without liability would be likely to shake public confidence in trust companies. The conclusions here reached are supported in general by numerous decisions in addition to those in the early part of

this opinion. A few only need be cited. *Lippitt* v. *Ashley*, 89 Conn. 451. *Lowndes* v. *City National Bank*, 82 Conn. 8, 16, 17. *Lyons* v. *Corder*, 253 Mo. 539, 552, 558–559. *Cunningham* v. *Shellman*, 164 Ky. 584, 597–598. *Wallace* v. *Lincoln Savings Bank, supra. Curtis* v. *Connly*, 257 U. S. 260.

The defendants are chargeable with simple interest on all sums found due from them from the time the loss to the bank occurred. *State Street Trust Co.* v. *Walker*, 259 Mass. 578, 584, and cases cited. *Gamble* v. *Brown*, 29 Fed. Rep. (2d) (C. C. A.) 366, 381. *McCormick* v. *King*, 241 Fed. Rep. (C. C. A.) 737, 746, affirmed *sub nomine Bowerman* v. *Hamner*, 250 U. S. 504, 515.

It is manifest that the master in reaching his findings as to each defendant was not guided by the principles here stated. The plaintiff's exceptions to the master's report, to the effect that the master adopted an erroneous legal standard of care and duty on the part of the defendants and reached conclusions inconsistent with essential primary facts found by him, must be sustained. It is not necessary to examine in detail the other exceptions of the plaintiff. The exceptions of the defendants to the master's report are overruled.

We do not undertake to determine whether enough facts are set out in the report to enable the entry of a final decree in the light of arguments of counsel directed to that end, or whether further findings will be needed either by the single justice or by the master upon evidence already heard or upon further evidence. No decree was entered. The case was reserved for our determination. The case therefore is remanded to the county court for further proceedings not inconsistent with this opinion.

*Ordered accordingly.*