ROBERT E. GOODWIN, trustee in bankruptcy, *vs.* JAMES E. SIMPSON & others.

Suffolk. January 10, 1935. — September 16, 1935.

Present: RUGG, C.J., CROSBY, PIERCE, DONAHUE, LUMMUS, & QUA, JJ.

*Corporation*, Officers and agents. *Sale*, Of securities. *Equity Pleading and Practice*, Master: findings; Appeal.

In deciding a suit in equity upon a master's report without report of the evidence, this court disregards conclusions of the master based wholly upon subsidiary findings, considers those findings only, and draws its own inferences from them.

Officers and directors of a corporation soliciting and investing the money of others are fiduciaries, and must use good faith and the care and judgment that a competent business man would give to his own affairs.

A director of a corporation, under fiduciary duty, who was diligent in the performance of his duties, was not liable for losses caused to it by the misconduct of or improper payments by the executive officers, not known by him and which he had no reason to suspect, though examination of the books might have disclosed them; but he was liable for a sum diverted, by the aid of his vote, from the corporation's funds to pay dividends upon the shares of another corporation.

The treasurer of a corporation was not liable to it for payments of its funds made by him, even if improper, where it was not shown that he

knew or ought to have known of the impropriety; nor for the payment of dividends which the corporation had contracted to pay to its shareholders, though the shares had been sold on an instalment plan not approved by the department of public utilities, in violation of G. L. (Ter. Ed.) c. 110A, § 8.

BILL IN EQUITY, filed in the Superior Court with a writ of summons and attachment dated July 7, 1928.

The suit was reported by *F. T. Hammond*, J.

The case was argued at the bar in January, 1935, before *Rugg*, C.J., *Donahue*, *Lummus*, & *Qua*, JJ., and afterwards was submitted to all the Justices except *Field*, J.

*J. B. Jacobs*, for the plaintiff.

*J. F. Bassity*, for the defendants Swift and another.

QUA, J.    The plaintiff as trustee in bankruptcy of the New England Investors Shares, Inc., a Massachusetts corporation, formerly called New England Investment Trust Incorporated and hereinafter called the corporation, now presses this suit only against the defendants Swift and Talbot to recover for losses to the corporation alleged to have been caused by their negligence and by improper payments out of the corporate funds made or permitted by them.    It is not now argued that they were guilty of actual fraudulent intent.

The cause is before us by report of the trial judge without decision, upon the pleadings and three master's reports and interlocutory decrees relative thereto.    The evidence is not reported, and the master states in his third report that the conclusions of his first and second reports are based solely upon his subsidiary findings.    We are therefore not bound by the master's conclusions, and it becomes our duty to decide the case solely upon the subsidiary findings and proper inferences therefrom.    *Nichols* v. *Atherton*, 250 Mass. 215, 217.    *Robinson* v. *Pero*, 272 Mass. 482, 484. *MacLeod* v. *Davis*, 290 Mass. 335.    This is rendered more difficult than need be because the basic findings are not made in narrative or consecutive form, but consist of a series of isolated and disconnected statements scattered through three reports and intermingled with ultimate conclusions. As to some questions involved, the basic findings are meager,

and more in the nature of subordinate conclusions than of precise findings of fact. It is difficult to reconcile some of the findings with others.

The general nature of the business carried on by the corporation is explained in *Commonwealth* v. *Benesch,* 290 Mass. 125, and need not be restated. The defendant Swift was the vice-president and a director during the entire period of the corporation's activities. The defendant Talbot was a director from September 20, 1927, and treasurer from November 7, 1927, up to the time of the filing of the bill.

Inasmuch as the corporation was engaged in a business in which it solicited the handling and investment of the money of others, the fiduciary obligations of its officers are not different from those of corresponding officers of a banking institution. See *General Mortgage & Loan Corp.* v. *Guaranty Mortgage & Securities Corp.* 264 Mass. 253, 261. The defendants recognize this in their brief. These obligations extend beyond good faith and freedom from evil intent and include the duty to exercise that degree of care, attention and even good judgment which a competent business man would exercise with reference to his own affairs. *Greenfield Savings Bank* v. *Abercrombie,* 211 Mass. 252. *Cosmopolitan Trust Co.* v. *Mitchell,* 242 Mass. 95, 118. *Prudential Trust Co.* v. *McCarter,* 271 Mass. 132, 137.

The plaintiff's most important contention is that the defendant Swift is liable for the sum of $219,643.60 as the loss sustained by the corporation by reason of its failure to purchase promptly the underlying securities to cover collateral trustee shares which were sold on the instalment plan. Apparently this "loss" resulted from the rise in prices of the underlying securities. It does not appear when the corporation began selling collateral trustee shares on the instalment plan or when it began to fail to cover them, but by December 31, 1926, it had sold and failed to cover over $800,000 worth and this amount rose rapidly to over $4,000,000 worth by March 1, 1928. Large as this sum was, however, it represented only a part and by no means the greater part of the total sales of collateral trus-

tee shares. The corporation did a large business, particularly in the year 1927. The purchase of the underlying securities was under the actual direction of one Benesch who had been an original organizer of the corporation and who owned or controlled all its stock. The directors "permitted" Benesch to act as general manager of the business, but without any formal vote to that effect. The failure to purchase the underlying securities as fast as collateral trustee shares were sold seems to have been due primarily to Benesch, though the fact must have been known to the treasurer, Simpson, and there was a record of it in the books. The directors "never received any operating statement." There are other findings in general terms, such as that the directors "failed to exercise diligence and . . . care," and similar statements, but we regard these as conclusions of the master from the more specific facts found. If they are not, it is impossible to tell to what they relate or what particular item they affect.

On the other hand, Swift was a practising lawyer. His work for the corporation seems to have been primarily as an adviser in legal matters rather than in any managerial or financial capacity. He faithfully attended every meeting of the directors and investigated and considered such matters as were brought before the board and voted thereon in good faith and as he believed for the best interests of the corporation. He did not know that any collateral trustee shares had been sold on the instalment plan until August, 1927, when he learned of it through his bank shortly before the meeting of the directors in September. He believed that all legal matters were being submitted to him when in fact they were being concealed from him by Benesch and Wells, the president. The board of directors had not authorized the sale of these shares on instalments nor was any plan for such sales submitted to them, and the approval of the department of public utilities had not been obtained. Swift was not informed and did not believe that Benesch had anything to do with the management of the corporation until September 20, 1927. When he first learned of the sales on instalments he inquired of Benesch. Benesch told

him there were only five or six instances, and he believed that statement. He remonstrated with Benesch and asked him to put a stop to it. Together with Talbot, he caused an investigation to be made and an accountant to be employed for that purpose, and the sale of shares on instalments was stopped and Benesch and Simpson were forced out of the corporation.

It is apparent that the gist of this charge against Swift consists only in his failure to know earlier than he did know what an investigation into the books and affairs of the corporation would have discovered and in his trusting other people more than in the light of subsequent disclosures now appears to have been wise. He was not in constant personal contact with the business and would be unlikely to learn how the sales were being made unless he did undertake an investigation into that matter, and there are no findings of facts which show that anything had come to his attention before September, 1927, which would have caused an ordinarily prudent man to make such investigation. When knowledge came to him he seems to have acted with reasonable promptness and vigor. He was not bound to be continuously present or to keep himself at all times familiar with everything which the books would have shown and he had a right to trust others to a reasonable extent and to rely upon the information which they gave him until something occurred which should have aroused his suspicion. He was not bound to "exhibit greater wisdom and foresight than may be fairly expected of the ordinary man in similar conditions." *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 137. While the length of time during which he remained in ignorance and the magnitude of the operations in instalment sales raise some doubt, yet the burden of proof is upon the plaintiff (*Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 138), and on all that appears we are not convinced that the findings of subsidiary facts show that Swift was negligent. It is unnecessary to consider other questions which have been argued relative to this item.

Substantially the same considerations apply to the plain-

tiff's contentions that Swift is liable for items totalling $46,935.62 paid to salesmen as commissions on instalment sales and to items totalling $39,454.64 paid in January and July, 1927, to purchasers of shares on the instalment plan in lieu of the dividends which would have been credited to them from the underlying securities, if underlying securities had been bought. We do not find Swift liable for these items.

We are not quite satisfied on the findings before us that either Swift or Talbot is liable to pay to the plaintiff the item of $1,046, being the amount of a dividend on the preferred stock of the corporation declared September 20, 1927. They had before them an accountant's report showing a surplus of $166,834.29. Swift inquired of Wells, the president, who under the by-laws had general oversight of the business, subject to the control of the directors, and whose veracity it does not appear he had any reason to question, and Wells informed him that there had been plenty of earnings during the quarter to pay the dividend, the amount of which was trifling compared to the size of the company.

Swift is liable for the sum of $2,494, the amount of a dividend declared with the aid of his vote as a director on preferred stock of the Discount Company of New England. We construe the findings as meaning that the corporation voted a dividend from its own assets payable to the stockholders of the discount company. While the relations of the two corporations were such that this payment is understandable and may have been consistent with good faith, it was not a proper use of assets of the corporation. Interest should be added from the date of payment.

Talbot is not liable for the sum of $10,000 which was paid by Simpson as treasurer to Benesch on November 7, 1927, the same day on which Talbot succeeded Simpson in that office. Talbot did not make the payment. It was made with his "consent and approval" after he had inquired of Robinson, who on the same day was elected managing director, and had been informed by him that Benesch had a credit balance due him of $14,000. While the master thought Talbot ought to have made further

investigation, it seems to us that the subsidiary findings are insufficient to show that he was negligent or that his "consent and approval" caused the making of a payment which would not have been made otherwise. See *Hathaway* v. *Huntley*, 284 Mass. 587, 592. It does not appear that at that time he had reason to doubt either Simpson's or Robinson's statement. There was in fact a credit to Benesch on the books for a much larger sum than $14,000, and although the master refers more than once to the wrongdoing of Benesch and evidently regarded this book credit in his favor as an improper one, there are no subsidiary findings that show that this was true. The fact that the directors had not voted to employ Benesch is not enough to prove that commissions were not due him as shown by the books.

On December 5, 1927, Talbot paid Wells, the president, $1,670 for eight weeks' salary in advance. Wells resigned the same day. It does not appear that Wells was not entitled to advance payments or that when the payment was made Talbot knew Wells was going to resign. The making of a payment in advance, standing alone, does not show wrongful conduct.

Talbot paid Benesch $564.23 as "personal expenses." The master finds that Benesch was not entitled to this money "as the result of his actions," but there is an absence of the necessary findings to support this conclusion, or to show that Talbot knew or ought to have known that the payment was improper.

There is nothing to show that Talbot should be held liable for $1,182.69 paid by him to Robinson.

. Other items are dealt with by the master, but have not . been argued by the plaintiff. We find in them no valid ground for liability.

There remains to be determined an issue as to $4,389.49 paid by Talbot in January, 1928, after he became treasurer and after he knew about the instalment sales. It does not appear that Swift knew of this payment. This money was paid to various purchasers on the instalment plan of collateral trustee shares which had not been covered by

underlying securities. It represented the amount of dividends from the securities to which these purchasers would have been entitled, if the securities had been bought. As we interpret the master's findings, the corporation had bound itself to buy these securities, and therefore owed to purchasers the dividends they were entitled to receive. The plaintiff contends that as these instalment sales had been made without approval of the plan by the department of public utilities, they were wholly void and any payments by the corporation on account of them were wrongful. G. L. c. 110A, § 8, as amended by St. 1924, c. 487, § 4. He cites *Kneeland* v. *Emerton*, 280 Mass. 371. While it is true that the opinion in that case speaks of a contract of sale in violation of the statute as "void," the question before the court was whether a purchaser who had completely executed his contract of purchase could recover his money. It was held that the parties were not *in pari delicto*, that the wrong was on the part of the seller and not of the buyer and that the full and complete protection which the statute was intended to afford buyers could be given only if the plaintiff were allowed to prevail. That case does not decide that the seller can set up his own wrong as an excuse for not carrying out his promises, or use a statute plainly intended for the purchaser's protection as a shield of defence against the purchaser. We think it was not a wrong for Talbot to make these payments to purchasers who had not repudiated the transaction on their part. See *Bauer* v. *Bond & Goodwin Inc.* 285 Mass. 117; *Cummings* v. *Hotchkin Co.*, ante, 78; *Grueby* v. *Chase Harris Forbes Corp.*, post, 156; *Doherty* v. *McAuliffe*, 74 Fed. Rep. (2d) 800.

A final decree is to be entered against Swift for payment of the sum of $2,494 and interest and costs, and dismissing the bill as to Talbot with costs to him.

*Ordered accordingly.*