WALTER I. WOODMAN,

Trustee in Bankruptcy of The National Boat and Engine Company,
In Equity,

*vs.*

WILLIAM W. BUTTERFIELD.

Kennebec.    Opinion June 21, 1917.

*Rule as to offering evidence or proof in an appeal in equity.    Rule where an insolvent
corporation makes preferred payments to or for the benefit of its directors.
Necessary acts on part of person elected as a director, to constitute
acceptance of said office.    Rule of law governing as to whether
certain payments were or were not fraudulent.    Meaning of
word "insolvency."    Rule where payments have been
made by an insolvent corporation to parties holding
the notes of the corporation upon which
notes the director of the corporation
was an indorser or guarantor.*

In a bill in equity, wherein the plaintiff, as trustee in bankruptcy of the National
Boat and Engine Company, seeks to recover of the defendant the amount of
certain payments, and the value of certain bonds, alleged to have been obtained
by him for his benefit from the corporation while he was a director thereof, and
when it was insolvent, the alleged ground of recovery being that the obtaining
and acceptance of said payments and bonds by the defendant or for his benefit
were in violation of his fiduciary duty as a director of said insolvent corporation
and in fraud of the rights of its creditors, the case being before the Law Court on
defendant's appeal from the decree of the sitting Justice.

*Held:*

1. All questions presented by the record are open for consideration under an
appeal in an equity cause, and such decree is to be directed by the appellate
court as the whole record requires, and the appellee is free to urge in the
appellate court his contention in regard to those claims on his part, presented
by the record, which the decree below did not sustain.

2.   It is the settled doctrine of this State where this action is pending, and the same doctrine is enforced by the highest courts of Illinois, the State where the alleged payments and transfers were made, that it is inequitable for a director of an insolvent corporation, whose position gives him an advantage in obtaining information of the affairs of the corporation, to protect his own claims against it to the detriment of its other creditors.

3.   The mere fact of the election of a person a director of a corporation does not constitute him a director unless he has notice, or is chargeable with notice, of that fact, for in addition to his election there must be an acceptance of the office by him, express or implied.

4.   The evidence is not sufficient to sustain the finding that the defendant was a director of the corporation prior to February, 1911, but is sufficient to establish the fact that he was a director of the corporation from and after February 1, 1911.

5.   Clause (e) of Section 70 of the bankruptcy act of 1898 creates no new right of the trustee to avoid transfers of property made by the bankrupt, but gives to the trustee authority to avoid any fraudulent transfers of his property by the bankrupt "which any creditor" might have avoided; accordingly the question whether a particular transfer was or was not fraudulent as to creditors does not depend upon the bankruptcy act, but upon the laws of the State where the alleged transfers were made.

6.   In deciding whether the corporation was insolvent at the time of the alleged payments and transfers we must accord to the term insolvent the meaning ascribed to it by the courts of Illinois, the State where the payments and transfers were made, which meaning makes the test whether the corporation was unable to pay its debts and obligations as they fell due in the usual and ordinary course of business.

7.   The evidence amply justifies the conclusion that the corporation was insolvent during all the time the defendant was a director of it, and that he knew, or is chargeable with notice of that fact.

8.   Where a corporation made payments in its usual course of business, although when it was in fact insolvent, to its outside creditors direct, who had no knowledge of its insolvency, and upon indebtedness for which a director of the corporation was secondarily liable as indorser or guarantor, when it does not appear that such payments were brought about by the procurement of such director, or that he knew that they were to be made, or when they were made, the trustee in bankruptcy of the corporation is not entitled to recover of such director the amount of such payments on the ground that they constituted fraudulent transfers of the corporation's property to him, even though it appears that the director ought to have known that the corporation was insolvent during the period when such payments were made.

Bill in equity brought by trustee in bankruptcy to recover of defendant certain moneys and property alleged to have been obtained by defendant for his benefit from an insolvent corporation of which

said defendant was a director. Cause was heard before a single Justice and from his ruling an appeal was entered to Law Court. Decree in accordance with opinion.

Case stated in opinion.

*Woodman & Whitehouse,* for plaintiff.

*Williamson, Burleigh & McLean, William D. Washburn, and William Carpenter,* for defendant.

SITTING: SAVAGE, C. J., CORNISH, KING, BIRD, HALEY, HANSON, PHILBROOK, MADIGAN, JJ.

KING, J. Bill in equity wherein the plaintiff, as trustee in bankruptcy of the National Boat and Engine Company, seeks to recover of the defendant the amount of certain payments, and the value of certain bonds, alleged to have been obtained by him for his benefit from the corporation while he was a director thereof, and when it was insolvent. The ground for recovery is alleged to be, that the obtaining and acceptance of said payments and bonds by said defendant or for his benefit were in violation of his fiduciary duty as a director of said bankrupt corporation and in fraud of the rights of its creditors and stockholders. The case is before us upon an appeal by the defendant from the decree of the sitting Justice.

No special finding of facts, or summary of the issues involved, was filed with the decree. The record is voluminous. It contains many uncontroverted facts and circumstances which are material to a clear understanding of the particular issues between the parties, and important to be considered in the determination of those issues. We will, therefore, at the outset briefly state some of those unquestioned facts and circumstances.

In 1907 the defendant became connected with the Racine Boat Manufacturing Company, a corporation doing business at Muskegon, Michigan. He was a large stockholder, a director and the secretary of that company. The other directors were Walter J. Reynolds, his wife Rose E. Reynolds, Paul B. McCracken and Frank A. Wilson. Reynolds was its president. The capital stock of the company was ultimately $200,000, substantially all owned by the directors. The defendant, together with Reynolds and McCracken, indorsed notes of the company to a large amount. January 8, 1909 that corporation made and delivered to Butterfield a trust deed or mortgage of its

property to secure him for his then existing indorsements for the company amounting to $160,000, for such future indorsements as he should make for it, and for any notes given to him by the company. That trust deed was never recorded, and it was withheld from record for the reason that, if recorded, it would impair the credit of the company; but there was an understanding between the other directors and Butterfield that the trust deed was to be recorded whenever Butterfield should determine that the company "was on its last legs."

In September, 1910, the National Boat and Engine Company was organized, under the laws of Maine, for the purpose of taking over the property and business of the Racine Company, and of various other companies and concerns carrying on a similar business. The plan of consolidation was for the new corporation to take over all the assets of the constituent companies and concerns at an appraisal to be made, and to assume all the liabilities of each. The difference between the assets and liabilities of each constituent was to be paid to it, or to its stockholders, in the bonds, the preferred stock, and the common stock, of the new company, in such proportions as the plan of consolidation provided for.

J. Q. Ross, attorney for the Racine Company, Reynolds its president, and H. S. Beardsley, of New York, appear to have been active promoters of the consolidation, and Butterfield was fully informed as to the plans and purposes of the consolidation from the beginning of the negotiations. He says that it was agreed at the outset between Ross, Beardsley, Reynolds and himself that no mention should be made, in carrying out the consolidation, of the unrecorded trust deed which he held of the Racine Company's property, and that it was further understood between them that after the new corporation had issued its bonds the trust deed was to be exchanged for enough of those bonds, to be held in escrow, to cover all his contingent liability on notes of the Racine Company and all of its direct liability to him. The consolidation was carried out as planned. Reynolds became president, Beardsley treasurer, and Ross secretary of the new corporation, and each was a member of its board of directors. All the assets of the Racine Company were transferred to the new or National Company by conveyances warranting the title thereto, and without mention of the unrecorded trust deed held by Butterfield. At the time of the transfer Butterfield was liable as indorser or guarantor of the

Racine Company's paper to the amount of about $100,000, according to his testimony, and that company was also indebted to him for about $24,500 on notes given by it to him.

The National Company authorized an issue of not exceeding $3,000,000 of first mortgage bonds, to bear date October 1st, 1910, and to be secured by a trust mortgage to the Astor Trust Company, of New York City, as trustee, covering all its property real and personal, present and future. The mortgage was executed, and on January 18, 1911 was accepted by the trustee. Some of the bonds were sold and others were used as collateral.

The National Company used the same office as the Racine Company, in Muskegon, Michigan, until December. 1910, or January, 1911, when it changed its general office from Muskegon to Chicago. At a special meeting of the board of directors of the National Company held at the Congress Hotel in Chicago on the 21st day of December, 1910, Butterfield was elected a director of the corporation. He attended the next meeting of the board of directors held at Chicago on March 13, 1911. At that meeting the business affairs and the financial status of the corporation were presented and discussed, and a resolve was passed that when necessary to borrow money in order to obtain funds to meet bills or accounts payable or to extend the time of payment on notes payable, the officers of the Company might use the bonds of the company as collateral at a rate not to exceed two for one.

At the time of the consolidation Butterfield held two notes of the Racine Company, one for $14,500, dated August 4, 1910, maturing February 4, 1911, with interest paid to its maturity, and the other for $10,000, dated September 6, 1910, maturing December 6, 1910, with interest paid to its maturity. Various payments were made to him and for his benefit on account of those notes prior to April 6, 1911. On that day Butterfield received $6750, at par value, of the bonds of the National Company. He admits that he received those bonds in full settlement of the balance then due on his two notes against the company, as then adjusted between him and Reynolds, its president. And on or about the same date, he received $3650, at par value, of the bonds of the National Company.

It has already been mentioned that there was an understanding between Butterfield, Reynolds, Ross and Beardsley, that, after the consolidation was completed, a sufficient amount of the bonds of the

new company should be exchanged for that unrecorded mortgage which Butterfield held covering the Racine Company's property. In furtherance of that understanding, and in May, 1911, bonds of the National Company to the amount of $88,000 were placed in the hands of Cross, Vanderwerp, Foote & Ross, as trustees, to secure Butterfield on his indorsements of the notes of the Racine Company, then amounting to about $44,000, and which indebtedness the National Company had assumed.

At a meeting of the board of directors of the National Company held August 25th, 1911, a resolve was passed directing the president to admit in writing, for the company and in its name, its inability to pay its debts and its willingness to be adjudged a bankrupt on that ground; and the petition in bankruptcy was filed against it August 28, 1911.

It appears that Butterfield, having paid the notes of the Racine Company on which he was liable as indorser or guarantor, sought to have the $88,000 of bonds, held by Cross, Vanderwerp, Foot & Ross, proved as a claim against the bankrupt estate. The claim was disallowed on the ground that the trust deed, for which the bonds were exchanged, not having been disclosed in the consolidation proceedings, was invalid as against the bankrupt corporation, and its surrender did not constitute a valid consideration for the delivery of the bonds in exchange for it; and that such delivery was voidable for the further reason that it constituted a fraudulent preference of a director at a time when the bankrupt was insolvent and known to be so by the claimant. *Butterfield* v. *Woodman*, 216 Fed., 208, affirmed, as to that part of the decision, in *Butterfield* v. *Woodman*, 223 Fed., 956.

The plaintiff's claims presented by the record may be thus briefly stated:

First. That Butterfield became a director of the National Boat and Engine Company on December 21st, 1910, when he was elected to that office; that the company was then, and thereafter continued to be, insolvent, and that he as a director of the company should have known that fact, and did know it; that between December 21st, 1910, and April 6, 1911, various payments were made by the company to him directly, or for his benefit, in reduction of the two notes which he held against the company, and that the plaintiff is entitled to recover of him in this action those payments, with interest thereon, upon the ground that they were fraudulent transfers of the company's property to him.

Second. That the $6750 of bonds received by Butterfield on April 6, 1911, in settlement of the balance due him on his two notes of the company, were the property of the company, and that the value of those bonds at the time they were converted by him, with interest thereon, is recoverable of him in this action upon the same ground of an unlawful and fraudulent transfer of the company's property to him.

Third. That the $3650 of bonds received by Butterfield on or about April 6, 1911, belonged to the company, and that their value at the time he converted them, with interest, is recoverable of him in this action for the same reason.

Fourth. That divers sums of money were paid by the National Company after December 21st, 1910, in reduction of the amounts of various notes which that company had assumed and upon which Butterfield was liable as indorser or guarantor, and that the amount of those payments with interest is recoverable in this action upon the same ground that they constituted fraudulent transfers of the company's property for the benefit of Butterfield while a director of the company, and when it was insolvent.

After hearing, the sitting Justice decreed:

(1) The bill is sustained as to the bonds of the National Boat and Engine Company delivered to the defendant of the par value of $3650.00.

(2) The bill is sustained as to $3500.00 received by the defendant from the National Boat and Engine Company between December, 1910 and February, 1911, as payments to him on his liability on certain promissory notes of said company.

(3) The bill is not sustained as to the bonds of the National Boat and Engine Company, delivered to the defendant by Reynolds, of the par value of $6750.00, these bonds becoming the property of Butterfield on delivery.

(4) If the bonds specified in item 1 cannot be delivered in specie to the trustee in bankruptcy, a master may be appointed to ascertain their market value, at the time they were demanded, for which sum only, Butterfield is hereby made liable to the trustee.

The plaintiff now claims, in accordance with the principles affirmed in *Trask* v. *Chase*, 107 Maine, 137, and in *Pride* v. *Pride Lumber Company*, 109 Maine, 452, 457, that, inasmuch as all questions presented by the record are open for consideration under the appeal, and such

decree is to be directed by this court as the whole record requires, he is free to urge before this court his contention in regard to those claims on his part, which the record presents, but which the decree below did not sustain.  We think he has that right.

In support of each and all of his claims contended for in this action, the plaintiff invokes the rule, which rests in the soundest wisdom and is supported by the great weight of authorities, that an insolvent corporation is not permitted to prefer a creditor who is also a director of the corporation.  The rule is sustainable upon the principle that it is inequitable for a director, whose position gives him an advantage in obtaining inside information of the affairs of the corporation, to protect his own claims against it to the detriment of its other creditors.  That rule is the settled doctrine of this State where this action is pending, and where the bankrupt corporation was created.  (*Symonds* v. *Lewis*, 94 Maine, 501, and *Pride* v. *Pride Lumber Company*, supra), and it is also adopted and enforced by the highest court of Illinois, the State where the alleged transfers were made.  *Beach* v. *Miller*, 130 Ill., 162, 22 N. E., 464.  That rule, therefore, must be applied in this case in deciding whether or not the alleged payments by the corporation to the defendant constituted fraudulent transfers of its property to him as one of its creditors.

We will consider the plaintiff's claims in the order in which we have hereinbefore stated them.

1.  The alleged payments made on account of the two notes which the defendant held against the corporation, exclusive of the bonds which he received in the final settlement of those notes.

When did the defendant become a director of the National Boat and Engine Company?  He was elected as such at a meeting of the directors held December 21, 1910.  He admits that he had previously expressed to Reynolds his wish to become a director of that company, because of his interest in its affairs, but he claims that he had no knowledge that he had been elected a director until sometime in February, when Reynolds notified him of his election.  He said: "It was the first part or the middle of February.  I couldn't remember. . . . Q.  You think it was the first part of February? A.  Possibly. . . . Q.  So that from the early part of February on you admit that you did know it?  A.  Sometime in February I knew that I had been elected."  The mere fact of the election of a person as a director of a corporation does not constitute

him a director unless he has notice, or is chargeable with notice, of that fact. In addition to the election there must be an acceptance of the office, express or implied, Cook on Corporations, 7th Ed., Section 624.

The sitting Justice sustained the plaintiff's bill as to $3500 received by the defendant from the National Boat and Engine Company "between December, 1910, and February 1911," as payments to him on his notes against the company. That decision implies that he found that the defendant was a director of the corporation from December, 1910—presumable from the time of his election to that office on the 21st of December. His decision as to questions of fact necessarily involved in the case is not to be reversed unless it clearly appears that such decision was erroneous. We are unable to find any evidence in the case tending to show that the defendant had any knowledge prior to February, 1911, that he had been elected a director of the corporation. He testified that he had no information of that fact until sometime in February, there was no testimony to the contrary, and it was not shown that he did anything prior to February from which it could be inferred that he considered that he was a director of the corporation. We are therefore constrained to the conclusion that the sitting Justice erred in finding that the defendant was a director of the corporation prior to February, 1911, and, therefore, chargeable with those obligations and duties which arise out of the fiduciary relations which the law regards as existing between a director of a corporation and its stockholders and creditors. He admits that he was informed of his election as director sometime in February, 1911, and that it may have been in the first part of that month. We think it may be reasonably held that he knew as early as the beginning of February, 1911, that he had been elected a director, and that from and after that time he was chargeable with the duties and obligations of a director of the corporation.

Was the corporation insolvent during the time the defendant was a director of it, and did he know or have reason to know that it was insolvent? In the decision of that question as involved in this case we are not controlled by the definition of insolvency contained in the bankruptcy act. This bill in equity is brought under the provisions of Clause (e) of Section 70 of that act. That clause of the bankruptcy act creates no new right of the trustee to avoid transfers of property made by the bankrupt, but merely gives to the trustee authority to

avoid any fraudulent transfers of his property by the bankrupt "which any creditor" might have avoided; and therefore the question whether a particular transfer was or was not fraudulent as to creditors does not depend upon the bankruptcy act, but upon the laws of the State where the alleged transfers were made. *Holbrook* v. *International Trust Co.*, 220 Mass., 150, 154; *In re Mullen*, 101 Fed., 413; *Trust Co.* v. *Trustees of Wm. F. Fisher & Co.*, 67 N. J., Eq. 602.

The alleged fraudulent payments and transfers by the bankrupt to the defendant, the value of which the trustee here seeks to recover, were made in the State of Illinois. It follows, therefore, that in deciding whether the corporation was insolvent at the time the alleged transfers were made, we must accord to the term insolvent the meaning ascribed to it by the courts of Illinois. And in *Atwater* v. *Bank*, 152 Ill., 605, 38 N. E., 1017, 1018, that court said: " 'Insolvency', when applied to a person, firm or corporation engaged in trade, means inability to pay debts as they fall due in the usual course of business." And that is the meaning ascribed to the term "insolvent" by common Law Courts, and courts of equity. *Clay* v. *Towle*, 78 Maine, 86; *Morey* v. *Milliken*, 86 Maine, 474.

The history of the National Boat and Engine Company, and a consideration of its financial condition, as disclosed by the record, shows that from its beginning it was practically insolvent in the sense of that term which makes the test the inability of the corporation to meet its existing obligations in the usual course of business as they become due. According to the report of the appraisers the new company assumed at the outset of its brief business existence the combined liabilities of all the constituent companies and concerns amounting to an indebtedness of $345,724.22. That indebtedness was immediately pressing for payment, and naturally so, because the holders thereof discovered that the property of their principal debtors had been transferred. But the new company immediately conveyed "all its property, real and personal, present and future" to secure an issue of bonds many of which were at once actually issued. It seems plain, therefore, that the new corporation became at once financially embarrassed. Its immediate and pressing obligations were more than a third of a million dollars, it had no available assets, and it must have been without credit. Its condition was helpless and hopeless. As early as December, 1910, it was in need of funds to meet its pay-roll, and Butterfield then came to its aid by borrowing for it,

on his own collateral, $1000 for that purpose. We entertain no doubt that the sitting Justice was amply justified by the evidence in finding that the corporation was insolvent during all the time Butter-field was a director of it. But his learned counsel urge that he did not know or have reason to know its condition. We think otherwise. He was perfectly familiar with the whole plan of the consolidation. He knew that the new company had assumed the debts of the con-stituents, and he knew that all the assets which the new company took over were immediately conveyed to secure a $3,000,000 issue of bonds, and that many of them were issued at once. In December, not long after the corporation was organized, he responded to its call for aid in meeting its pay-roll. He secured frequent and material payments in reduction of his two notes which the company had assumed, and he requested with urgency, culminating in a threat of legal proceedings, that his indirect liability as indorser on paper which the company had assumed should be secured by a deposit of bonds of the company as collateral. He was present and took part in the meeting of the directors of the company on March 13, 1911, when the resolve was passed "that when necessary to borrow money in order to obtain funds to meet bills or accounts payable, or to extend the time of payment on notes payable," the officers were authorized to use the bonds of the company as collateral at a rate not to exceed *two for one*. And on April 6, 1911, he accepted, at their *par value*, at least $6750 worth of the company's bonds in settlement of the balance of his notes for which the company was liable, and he did so with full knowledge that the company had found it very difficult to sell its bonds, and at much less than par. Considering the facts and cir-cumstances disclosed we are of opinion that the defendant knew or ought to have known, during all the time he was a director of the company, that it was insolvent.

He admits that he received, on account of his notes, a payment of $1200 on February 3, 1911, and another payment of $1500 on Febru-ary 6, 1911. For these, with interest thereon from the dates of payment, we think he is liable in this action, upon the ground that they constituted unlawful transfers of the company's property to him as a director-creditor of the corporation. We do not find from the evidence sufficient proof that he received any other payments thereon between February 1st, 1911, and April 6, 1911, when a final settlement of the balance due on the notes was made.

2.   The transfer to him of the $6750 of bonds on April 6, 1911.

He claims that these bonds were the property of Mr. Reynolds from whom he received them.   We have had considerable doubt as to that.   But the sitting Justice so found, and we think it has not been shown that his finding is clearly erroneous.   On April 4, 1911, Reynolds wrote the defendant in reference to a settlement of the latter's claims against the Racine Company, which the National Company had assumed, and in that letter said, "but for the sake of good fellowship I am willing to sacrifice *my own securities* for the purpose of getting this entire matter adjusted without litigation," and he therein offered to turn over to the defendant $5000 of his bonds and $1000 of his preferred stock.   Butterfield did not accept that offer.   He testified that on April 6, 1911, he and Reynolds reached an adjustment of the balance due him, in settlement of which he received the $6750 of bonds at par, supposing that they were Reynold's bonds. Reynolds did not testify in this case.   There may be some signifi-cance in the language of the receipts which the defendant gave on April 6 for both lots of bonds.   As to the $6750 worth, the receipt reads, "Received from *W. J. Reynolds* the following National Boat & Engine Company Bonds:" (describing them); but as to the $3650 worth it reads, "Received of *W. J. Reynolds, President of the National Boat and Engine Company,* the following securities:" (describing those bonds).   We therefore think the decree as to the bonds of the par value of $6750 should not be reversed.

3.   The transfer of the $3650 of bonds on or about April 6, 1911, as represented by the defendant's receipt of that date.

When first inquired of in respect to receiving those bonds the defendant said he had no distinct memory about it, but was inclined to think that after the settlement Reynolds borrowed that amount of bonds of him, and that the receipt represented the return of them, saying "whatever it was, it was on an exchange basis and didn't multiply or increase the $6750 bonds."   The plaintiff filed a petition to reopen the hearing to introduce evidence that the defendant had and retained both lots of bonds, and in his affidavit in answer to that petition, which affidavit is made a part of the record, the defendant states that he was mistaken in his testimony as to the $3650 of bonds, but that he is now satisfied that the bonds were delivered to him as being those to which he was entitled on the purchase by the National Company of the assets of the Racine Company, of which he was a

stockholder. And he further says in his affidavit that according to his best recollection the $3650 of bonds was "the exact amount" that he received as a stockholder of the Racine Company under the plan of consolidation. We note in the report of the appraisers as to the Racine Company that they show the net worth of that company—the excess of assets over liabilities, to be $808,146.42, and they state, "Plan of Purchase: Bonds $90,350, Preferred Stock 361,510, Common Stock $356,290, total $808,150." If that was the plan of purchase of the net worth of the Racine Company, then it would seem that $3650 would not be "the exact amount" of the defendant's share of bonds coming from the consolidation, since it appears from his own testimony that he owned at least a quarter of the capital stock of the Racine Company. We strongly suspect, after a carful study of the evidence, that *both* lots of bonds were received as payment of the real balance found due Butterfield in the adjustment between him and Reynolds on April 6, 1911. According to a statement put into the case, which both parties seem to concede is substantially correct so far as it shows payments to Butterfield on his notes, there was due Butterfield, after the February payments of $2500 were credited, $11,937,89. The defendant did not satisfactorily explain how that was reduced to $6750. He said it was "a final settlement of give and take of all differences to that date", but he could not recall any particular items or matters that reduced the balance of $11,937,89 to $6750. We find in the record evidence of an entry on the books of the company under date of January 25, 1911, tending to show a payment of $1500 on "notes payable W. W. B." That payment was not on the aforesaid statement, which was prepared by some official of the company and sent to Butterfield *prior* to the February payments, for he put those February payments on the bottom of the statement in pencil. The last of the other payments listed on the statement is "1-20-11, 1000." If that payment of Jan. 25, 1911 be deducted from the $11,937.89 there will be a balance of $10,437.89, which might be changed somewhat by interest accrued on the one side and the other up to April 6, 1911. And the total of the two lots of bonds is $10,400, a significant fact in this connection, we think. In our opinion no error is shown in holding the defendant liable for the value of the $3650 of bonds at the time he converted them, with interest thereon. He received them from the company, and his explanation of the transaction is not convincing.

4. Such payments as were made by the National Boat and Engine Company, while the defendant was a director thereof, on notes the payment of which the company had assumed and upon which the defendant was liable as indorser or guarantor.

There is evidence that some such payments were made to the holders of the notes, but not to Mr. Butterfield, and it is not contended that the holders of the notes had any knowledge that the National Company was insolvent when the payments were made. It is true that those payments reduced the defendant's contingent liability for debts which the company had assumed. But the evidence does not show that he procured the payments to be made. Neither does it satisfactorily appear that he knew when the payments were made, or even that they were to be made.

We think it would be going too far, to hold that a director of a bankrupt corporation is liable to pay to its receiver, or to its trustee in bankruptcy, an amount equal to the payments which the corporation may have made in its usual course of business, although while it was in fact insolvent, to its outside creditors direct who had no knowledge of its insolvency, but upon indebtedness for which the director is secondarily liable as indorser or guarantor, when it does not appear that such payments were brought about by the procurement of the director, or that he knew they were to be made, or when they were made; and even though it appears that the director ought to have known that the corporation was insolvent during the period when such payments were made. See *Butterfield* v. *Woodman*, 223 Fed., 956, 961. And we are therefore of opinion in this case that the plaintiff is not entitled to recover the amounts of alleged payments made by the corporation to the holders of notes for which the corporation was liable and upon which the defendant was indorser or guarantor.

Let the decree below be modified in accordance with this opinion.

*So ordered.*