GEORGE S. VAN SCHAICK, Superintendent of Insurance of the State of New York, as Liquidator of GENERAL SURETY COMPANY, Plaintiff, v. HAROLD G. ARON and Others, Defendants.

Supreme Court, Special Term, New York County, February 5, 1938.

522

*Harry Rodwin* [*Abraham J. Halprin* and *Samuel Boksenbom* of counsel], for the plaintiff.

*A. C. Spooner,* for the defendant Harold G. Aron.

*Edmund J. Donegan,* for the defendant Max N. Koven.

*Max N. Koven* [*Edmund J. Donegan* of counsel], for the defendants John A. Dilliard, Edmund J. Donegan, Frank H. Kenny, Charles P. Loeser, Albert N. Roemer and A. Albion Russell.

*Kadel, Van Kirk & Trencher* [*Emanuel Schwartz, Bernard Trencher* and *Samuel Silverman* of counsel], for the defendants David H. Knott and John Kadel.

*James E. O'Kane,* in person.

HOFSTADTER, J. This is an action by the Superintendent of Insurance as liquidator of the General Surety Company to recover

from its directors damages claimed to have been sustained by reason of alleged illegal investments and loans of the funds of the company. On the trial the plaintiff offered proof of four transactions urged to have been in contravention of statute. In general these were investments of the General Surety Company in the stock of National American Company, Inc., and alleged loans by the General Surety Company to the National American Company, Inc., either unsecured or on the security of other insurance stock.

The corporate organization and inter-relation of the companies involved in these transactions is as follows:

The General Surety Company and the State Title and Mortgage Company were domestic insurance companies (now in liquidation) formed under the pertinent provision of the Insurance Law. The National American Company, Inc., was a holding company organized under the Stock Corporation Law, and was the parent company of these insurance companies. National Lloyds Corporation and Realty Foundation, Inc., were domestic business corporations organized under the Stock Corporation Law. With respect to stock ownership it is conceded that National American Company, Inc., owned over ninety-nine per cent of the stock of the General Surety Company and fifty per cent of the stock of the State Title and Mortgage Company; and further that National Lloyds Corporation and Realty Foundation, Inc., were wholly owned subsidiaries of General Surety Company.

The plaintiff contends that each of the transactions sued upon was prohibited by the provisions of subdivision 4 of section 16 of the Insurance Law; and liability is asserted against each of the individual defendants based on their status and activities as directors of General Surety Company at the time the transactions were consummated. All of the defendants deny illegality and the characterization of two of the transactions as loans, or that any loss resulted therefrom; as to some transactions they press the defense of the Statute of Limitations; and the defendants Aron, Kadel and Knott disclaim any individual responsibility as directors.

Although the complaint alleges as an additional ground of liability that the transactions complained of were improvident, there was no direct or substantial proof to support this charge and it may be disregarded. Nor is it asserted or even remotely suggested by the plaintiff that the officers and directors of the General Surety Company were guilty of any conscious fraud, or that they were actuated by improper motives for personal gain.

In view of the complexity and comprehensiveness of the issues raised by the defenses, each will be discussed separately.

The initial consideration is the illegality and character of the transactions sued upon.

The transactions for which plaintiff seeks recovery are:

1. Loans by General Surety Company of $350,000 par value of Realty Foundation, Inc., bonds to National American Company, Inc., upon the security of 5,000 shares of stock of State Title and Mortgage Company.

2. The purchase by General Surety Company of 30,900 shares of capital stock of National American Company, Inc., at a total purchase price of $164,919.25.

3. An alleged unsecured loan of $64,000 by General Surety Company to National American Company, Inc., evidenced by a promissory note of the borrowing corporation.

4. A series of alleged unsecured loans totaling $921,500 by the General Surety Company to National American Company, Inc., through the agency of its wholly owned subsidiary, National Lloyds Corporation.

The plaintiff seeks recovery on these items in the sum of $1,021,801.24; the additional amount representing monthly charges for interest on outstanding balances to the date of liquidation less credits in the total sum of $17,000.

Since the claim of illegality is based upon the charge that each of the four transactions enumerated violated subdivision 4 of section 16 of the Insurance Law, the critical issue presented is the proper construction of that section, which reads as follows: " No such funds of any domestic insurance corporation shall be invested in or loaned on its own stock, nor invested in or loaned on the stock of any insurance corporation, nor invested in or loaned on the stock of any corporation which has invested in or loaned any of its funds on the stock of any insurance corporation or which has invested in or loaned any of its funds on the stock of any corporation having an investment, interest or equity of any nature or description in the stock of an insurance corporation, except as herein provided. In the case of a stock insurance corporation, other than life, it may invest not more than fifty per centum of its surplus funds directly in the stocks of other insurance corporations. Such domestic insurance corporation other than life may invest in or loan its funds on the stocks, bonds or other evidence of indebtedness of any solvent institution incorporated under the laws of the United States or of any State thereof, notwithstanding that such institution has an investment, interest or equity of any nature or description in the stocks of any insurance corporation or corporations, including the stock of the investing insurance corporation, provided that such investment, interest or equity is not in the aggregate in excess of five per centum of the total gross assets of such institution. In determining the condition of any domestic insurance

corporation investing its funds as herein permitted in the stock of an insurance company, the Superintendent of Insurance shall only allow such stock as an asset at the value ascertained by dividing the aggregate amount of the surplus and capital of such insurance company by the number of its shares of capital stock issued."

Assuming at this point the nature and character of the advances as asserted (there is dispute only as to items 3 and 4), it is apparent and beyond cavil that each of the transactions sued upon directly contravenes the prohibition contained in the first and third sentences of the quoted enactment. In each instance the transaction involved either transfers of funds of a domestic insurance company on the security of other insurance stock (which is forbidden by the first sentence of the subdivision), or investments, by loan or otherwise, in the stock or other evidence of indebtedness of the National American Company, Inc., which had more than five per cent of its total gross assets invested in the stock of insurance companies (which is forbidden by the first and third sentences of the subdivision).

The defendants contend that section 16 must be read as a whole and that " no interpretation of a word, phrase or sentence contained in it should be made without reference to the scheme of the entire section." (*Matter of General Reinsurance Corporation* v. *Pink*, 269 N. Y. 347.) They urge that the second sentence of subdivision 4 of section 16 of the Insurance Law which permits a domestic insurance company to " invest not more than fifty per centum of its surplus funds directly in the stocks of other insurance companies," when read in conjunction with the first and third sentences, reveals a legislative intent to modify the interdictions contained therein so as to validate transactions otherwise forbidden so long as less than fifty per cent of the surplus funds of the company are utilized.

This construction is untenable and does violence to the clear and unambiguous language of the enactment. The difficulty inherent in the contention of the defendants is that they ask the court in effect to rewrite the statute in accordance with what they believe the Legislature should have, and, therefore, must have intended. The literal language of a statute may be disregarded only where the intent of the Legislature is clearly expressed to the contrary. (*Matter of McDonald*, 225 App. Div. 403.) But subdivision 4 is unambiguous and accordingly there is no scope for any strained construction based upon a presumed legislative intent which is in conflict both with the legislative history with respect to the subject-matter of the subdivision and its express language.

The enactment unequivocally forbids any investment in or loan upon its own stock or the stock of any insurance corporation by a

domestic insurance company. It similarly prohibits any invest-
ment in or loan upon the stock of any corporation which has more
than five per cent of its total gross assets invested in insurance
stocks. It permits, on the other hand, loans by a domestic insur-
ance company to a corporation having less than a five per cent
insurance interest; and up to fifty per cent of its surplus funds a
*direct* investment in insurance stocks is allowed. The enactment
expressly makes a distinction between funds " loaned on the stock
of any corporation " and permission to " invest not more than
fifty per centum of its surplus funds directly in the stocks of other
insurance corporations."

The second sentence, which permits a direct investment in
insurance stocks, omits the word " loan." While it is true that
" invest " is a generic term which may include loans, throughout
section 16 the Legislature has meticuously employed the expressions
" invest in or loan upon," or " invest, by loan or otherwise,"
whenever the context called for such alternate expression. It is,
therefore, not without significance that the second sentence of the
subdivision merely permits of investment. Moreover, the addition
of the word " directly " indicates that the omission was purposeful
and not due to any oversight. This is obvious from the prior enact-
ments on this subject. Up to this time the legislative policy
frowned on inter-control of insurance companies. Originally,
investments in the stocks of other insurance corporations exposed to
similar hazards had been forbidden, and more latterly in 1913
were allowed only upon the consent of the Superintendent of Insur-
ance upon compliance with certain conditions. In 1925 subdivision
4 was amended to include the second sentence, and thereby control
of one insurance company by another was authorized. The sole
purpose and intendment of this change was to permit control by
direct investments where formerly such control was prohibited.
In the absence of a clear expression of intent, the court may not
determine that the Legislature also intended to vary the whole
scheme of the statute and permit that which not only had been
forbidden in previous enactments, but also was specifically pro-
hibited in the same enactment which effected the amendment.

Nor are the transactions complained of within the letter of the
qualifying sentence. By no stretch can the privilege to invest
directly in insurance stocks be interpreted to permit an unsecured
loan to a non-insurance corporation which has not only more than
five per cent but nearly one hundred per cent of its total gross
assets invested in insurance stocks.

The court may not concern itself with the wisdom or propriety
of statutory provisions which permit direct investments of substan-

tial sums in insurance stocks but prohibit loans in any amount to corporations holding insurance stocks. It is sufficient that the literal language of the enactment and its context precludes any other construction. The language of the Court of Appeals in *Matter of General Reinsurance Corporation* v. *Pink* (269 N. Y. 347, 351) is pertinent: "It is trite to say that the insurance business in its manifold forms affects the public as few others do, and hence that the financial stability of insurance companies is an element of prime importance to the public. Without referring in detail to the many scattered provisions obviously framed for purposes of safety and security, we may say broadly that almost all of them were evoked by dire experience."

In view of this determination it becomes unnecessary to discuss in detail the further arguments of the defendants in connection with the fourth item sued upon, other than to state that I am clear that the funds transferred to the borrower, in any event, were in excess of fifty per cent of the surplus funds of the General Surety Company. In this aspect illegality would nevertheless be inherent in this transaction, even if the construction contended for is adopted.

The conclusion is compelling from the foregoing discussion that the transfers of funds (if they were loans within the provisions of section 16) and the purchases of stock were in violation of statute. The plaintiff has established the illegality of the first and second items sued upon. As to these there is no dispute as to the nature and character of the transactions. With respect to the unsecured advances to National American Company, Inc., the defendants contend that these transactions in part were not loans within the meaning of that term as employed in section 16 of the Insurance Law; and that, in any event, they neither resulted in damage nor caused any change in the position of General Surety Company. In addition, the measure of damage claimed on the first item is attacked.

It appears with respect to the fourth item sued upon that on December 23, 1930, National Lloyds Corporation (a wholly owned and controlled subsidiary of General Surety Company) effected a transfer of $908,000 by means of a check drawn to the order of National American Company, Inc. It is conceded that this sum was received and disbursed by the latter. The funds thus advanced were furnished to National Lloyds Corporation by General Surety Company. The defendants have stipulated with regard to this single transaction that the court may consider National Lloyds Corporation the agent of General Surety Company and treat the advances to National American Company, Inc., as if they had been made directly by the principal itself. In any event, to resolve any

ambiguity as to the scope and extent of the concession, the court so determines its status as agent from the evidence before it.

On subsequent dates three additional loans, totaling $13,500, were similarly executed. There is no dispute as to the loan character of these cash advances, nor is the resultant loss, which is conceded, offset by part payments made by the debtor. While the debit and credit account shows repayment in the sum of $17,000 on account of the entire indebtedness, I conclude the proper rule of law applicable in this case to be that partial payments may be applied in reduction of the principal sum due only where such payments exceed the interest which has accrued. (*Haffey* v. *Lynch*, 193 N. Y. 67, 71.) This not being the fact, it is not pertinent that " where both debtor and creditor have failed to direct the application of a payment, it is the duty of the court to apply it according to equitable principles." (*Lichtenstein* v. *Grossman Const. Corp.*, 248 N. Y. 390. See, also, *Orleans County Nat. Bank* v. *Moore*, 112 id. 543.) In this view of the law the plaintiff has established the claimed loss as well as the illegality of these latter loans.

In defense of the advance of $908,000 on December 23, 1930, the defendants proffered the testimony of an accountant who traced the flow of funds in the National American Company group on that day. There is no substantial conflict as to the numerous transactions which took place in order to make possible the complicated exchange of funds among the many companies in the group; and it would unduly lengthen this opinion to set them out in detail. The defendants take the position that the transfer sued upon as well as the other related transactions were merely adjustments of inter-company accounts. They conclude from this, *first*, that the transfers may not be characterized as loans, and *second*, even if so characterized, there was no loss to General Surety Company or any substantial change in its financial condition.

The first conclusion is without substance. The transactions were executed in the form of clearance of checks, and in each instance they were designated in all the relevant records of the corporation involved as loans. Funds actually passed from one company to another in return for evidences of indebtedness, and quite apart from the obvious loan character of the transfers, it would be subversive of a well-recognized and sound public policy to permit directors of financial institutions whose activities are affected with a public interest to avoid liability by a claim that transactions were not what they purported to be. (*Mount Vernon Trust Company* v. *Bergoff*, 272 N. Y. 192.)

However, this doctrine of public policy may not be invoked to nullify the second contention that the transactions, however they

may be regarded, resulted in no loss to the corporation. Therefore, the vital question is the consequences of the loan to General Surety Company. The court concludes that the plaintiff has failed to establish any actual loss was sustained on account of the loan of $908,000.

Both the plaintiff and the defendants rely solely on the books and records of the corporations involved to sustain their respective positions. Whatever the reason for the interchange of funds may have been, in the final analysis the consolidated cash position of all the affiliated companies was in no wise altered. The only effect of the transfers on General Surety Company was to substitute the obligation of National American Company, Inc., for that of other members of the affiliated group. The plaintiff urges that the law presumes that the obligations discharged or created were all worth their face value (*Thomas* v. *Zahka*, 228 N. Y. 187); and that the assets dealt with were worth the amounts for which they were transferred. (*Warner Quinlan Co.* v. *Charat, Inc.*, 143 Misc. 443; *Matter of Auditore*, 136 id. 664.) While these presumptions are sufficient to make out a *prima facie* showing of loss, the testimony of the defendants has balanced the scale, and the plaintiff on this issue has not sustained the burden of proof. In determining the liability of the individual directors the court must deal with the realities of the situation with due regard to substance and not form. The court is not constrained to accept a conclusion which is based solely on a presumption of fact, which patently is not in accord with the true state of the record.

What has been said applies with equal force to the loss sustained on the unsecured loan of $64,000 and the loan of $350,000 Realty Foundation, Inc., bonds. But as to the latter, the parties have stipulated that the collateral underlying the bonds was worth forty per cent of the face amount. To this must be added, by the terms of the stipulation, the value of the obligations of the principal obligor and guarantor which is stated to be twelve and one-half per cent of the face amount of the bonds. Accordingly the amount of damage sustained on this transaction is fifty-two and one-half per cent of the face value of the bonds loaned, or $183,750.

Without reference at this time to the individual liability of the directors, the court concludes that the plaintiff has established the illegality of each of the transactions sued upon, and a resultant loss in the following amounts, exclusive of interest: On the first item, $183,750; on the second, $164,919.25; on the fourth, $13,500. There is no loss established on the third item. The total damage to General Surety Company is $362,169.25 and the plaintiff may have judgment accordingly, subject only to the determination of

the additional issues raised by some of the defendants with respect to their individual responsibility and the application of the Statute of Limitations to those transactions antedating December 23, 1930.

The defense of Statute of Limitations is next considered.

This action was actually commenced in November, 1934. However, on December 21, 1933, all of the defendants except Donegan and Knott signed a stipulation waiving the further running of the Statute of Limitations. It has been held that this stipulation is binding upon the defendants and that they may plead the Statute of Limitations as a bar only to the extent that the statute may have been a bar on December 21, 1933. (*Van Schaick* v. *Metz*, 244 App. Div. 719.)

The defendant Donegan, apparently through some oversight, was not requested to stipulate, nor did he agree to do so. The defendant Knott was present at the conference with the representatives of the plaintiff, and it is not disputed that while he orally agreed to be bound in the same manner as his codefendants and agreed to sign the stipulation, he subsequently refused to consummate his oral undertaking.

The initial consideration is the applicability of the statute (without regard to any stipulation) to the transactions sued upon. The Statute of Limitations in an action against directors of an insurance corporation is set forth in subdivision 4 of section 49 of the Civil Practice Act. (*Van Schaick* v. *Cronin*, 237 App. Div. 7.) Therefore, to be timely, this action must have been commenced within three years after " the discovery by the plaintiff of the facts under which * * * liability was created."

The Superintendent of Insurance suing as liquidator merely asserts rights of the corporation, which is the real plaintiff. " The knowledge of the corporation therefore is the date from which the statute begins to run." (*Van Schaick* v. *Cronin*, N. Y. L. J. Aug. 17, 1932, p. 584.) Generally speaking, discovery is imputed to the corporation when the facts upon which liability may be predicated are made known to persons having the right and authority to sue on its behalf.

The earliest transaction for which the plaintiff seeks recovery occurred on July 11, 1930, which date is more than three years prior to the date of the stipulation. The Superintendent took possession of the General Surety Company on January 6, 1933. During the intervening period of wrongdoing directors were in exclusive control of the officers of the company until March 9, 1932, when four new directors were elected and took office.

In the absence of a provision tolling the statute until discovery, there is a conflict in the foreign authorities as to the general appli-

cation of a straight Statute of Limitations to the facts here involved. Some jurisdictions hold that even where the statute does not provide for any suspension (other than for fraud), it tolls while wrongdoing directors remain in control of the corporation. (See *Ventress* v. *Wallace*, 111 Miss. 357; 71 So. 636; *Schilling* v. *Parman*, 35 F. [2d] 780; *Greenfield Savings Bank* v. *Abercrombie*, 211 Mass. 252, 259; 97 N. E. 897; *Williams* v. *McKay*, 40 N. J. Eq. 189, 198.) There are decisions of equal force and persuasion to the contrary: *Mobley* v. *Faircloth* (174 Ga. 808; 164 S. E. 195); *Lippitt* v. *Ashley* (89 Conn. 451; 94 A. 995); *Hughes* v. *Reed* (46 F. [2d] 435).

The decisions in this State on the status of directors in their dealings with the corporation and its stockholders and creditors are not wholly clear. But a fiduciary relationship is always recognized and the law imposes on directors duties analogous to those of a trustee towards his *cestui que trust*. (*Levy* v. *Pacific Eastern Corporation*, 153 Misc. 488, 491.) Whatever the precise relationship may be, there are indications in the reported cases that the analogy of strict trusteeship to directorships does not apply to the tolling of the Statute of Limitations (*Mason* v. *Henry*, 152 N. Y. 529; *Brinckerhoff* v. *Bostwick*, 34 Hun, 352; revd. on other grounds, 99 N. Y. 185); and that in the absence of any fraudulent concealment, the statute begins to run from the date of the illegal transactions.

However, since the *Brinckerhoff* and *Mason* cases were decided, the law was amended to include the provision of discovery by the plaintiff. Diligent research by counsel has not brought to light any cases in this jurisdiction which determine when the plaintiff is deemed to have discovered the facts.

The plaintiff submits that the discovery required by the statute in this case is the discovery by the liquidator, or by any persons not involved in the wrongs complained of, who would be in a position to maintain an action against the wrongdoers on behalf of the corporation. The defendants in effect do not contend for a different rule of construction, but they urge that sufficient discovery may have been had by the Superintendent of Insurance (prior to liquidation), by stockholders and by non-participating directors.

Whatever the law may have been theretofore, it is clear that the knowledge of *wrongdoing* directors, in the light of the discovery provision, may not be imputable to the corporation so as to commence the running of the limitations period. To so determine would render the discovery provision nugatory, for otherwise, in every case, the statute would of necessity begin to run from the date of the transaction. The decisions in other jurisdictions based on substantially similar statutory provisions are to this effect, and

no decisions to the contrary have been presented to the court. (*Smith* v. *Lyle*, 59 S. D. 534; 241 N. W. 512; *Adams* v. *Clarke*, 22 F. [2d] 957; *Reid* v. *Robinson*, 64 Cal. App. 46; 220 P. 676.) It is untenable to assume that wrongdoing directors would set in motion proceedings to charge themselves with liability because of their illegal acts. In an unreported decision the late Mr. Justice Tierney stated: " Under this statute, however, it would be unreasonable to hold that acts of misconduct of an officer or director were discovered by the corporation because an officer or director knew of them. In such a case two offending officers or directors could give one another absolution by each keeping silent as to the other's derelictions." (*Phillips* v. *Bank of New York*, N. Y. L. J. April 14, 1927, p. 240.)

In the instant case the wrongdoing directors were in exclusive control of the affairs of the corporation up to March 9, 1932. The basis of their liability, whether for negligence or for active participation in the wrongful acts, is not significant; the statute is tolled so long as the controlling directors are subject to suit and liability for their acts. Of course, the knowledge of the new directors who were elected on March 9, 1932, is imputable to the corporation, but that date is less than three years from the date of actual suit. The Statute of Limitations becomes operative as of that date.

The Superintendent of Insurance from time to time, through his representatives, examined the books of the company and might have in the course of such examinations discovered the wrongful acts. It affirmatively appears, in the first place, that the only examination conducted by the Superintendent was filed on March 1, 1932. But, in any event, prior to liquidation the Superintendent was acting in his capacity as a State official and not on behalf of the corporation. A valid distinction may be made between facts discovered *qua* Superintendent and facts ascertained *qua* liquidator of the corporation. Prior to liquidation the knowledge of the Superintendent, if any, is not imputable to the corporation. (*Smith* v. *Lyle*, 59 S. D. 534; 241 N. W. 512.)

Nor is the knowledge of National American Company, Inc. (which owned substantially all of the stock of General Surety Corporation), sufficient to constitute discovery under the Statute of Limitations. Each transaction sued upon was participated in by this stockholder, and the same reasons which vitiate the knowledge of wrongdoing directors are equally applicable in the case of a participating stockholder. The court does not determine that in no case is the knowledge of a stockholder to be imputed to the corporation (*Curtis* v. *Connly*, 257 U. S. 260); it is merely determined that such knowledge is not imputable on the facts of this case.

Accordingly, it is concluded that subdivision 4 of section 49 of the Civil Practice Act does not bar any of the transactions sued upon.

In view of this ruling, it is unnecessary to discuss the scope and effect of the oral stipulation entered into between the plaintiff and the defendant Knott. (See *Theodore* v. *News Syndicate Co., Inc.,* N. Y. L. J. April 2, 1937, p. 1627.)

The remaining issues concern the responsibility of the individual defendants.

A director of a corporation is liable for the loss sustained by the corporation on an illegal loan or investment if he participated in, approved or acquiesced in the transaction, or was negligent in permitting it. (*Kavanaugh* v. *Commonwealth Trust Co.,* 223 N. Y. 103; *Brinckerhoff* v. *Bostwick,* 88 id. 52; *Hun* v. *Cary,* 82 id. 65.) Negligence is equally as valid a basis for liability as active participation.

The status of director, in and of itself, does not impose liability; the plaintiff must also establish either that the director participated in the act or suffered it to be permitted with actual knowledge of its occurrence (*Arthur* v. *Griswold,* 55 N. Y. 400), or with imputable knowledge arising from the failure to exercise ordinary prudence in ascertaining facts a diligent director would know. (*O'Connor* v. *Bankers Trust Company,* 159 Misc. 920, 947.) Each case is *sui generis* with respect to the negligence of a director, and the degree of care required necessarily depends on the facts of the particular case. (*Broderick* v. *Horvatt,* 148 Misc. 731, 733.)

In the final analysis a director is responsible only for preventable losses occasioned by his own neglect of duty. (*Susquehanna Line, Inc.,* v. *Auditore,* 223 App. Div. 585, 588; *People* v. *Equitable Life Assurance Society,* 124 id. 714, 731; *Briggs* v. *Spaulding,* 141 U. S. 132.) But a person who accepts the office of a director likewise accepts the duties and responsibilities incident thereto. "The law governing the duties of directors in financial institutions is well settled. They are summoned to the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs. (*Hun* v. *Cary,* 82 N. Y. 65; *Cassidy* v. *Uhlmann,* 170 id. 505; *Hanna* v. *Lyon,* 179 id. 107, 110; *General Rubber Co.* v. *Benedict,* 215 id. 18; *Campbell* v. *Watson,* 62 N. J. Eq. 396; *Warner* v. *Penoyer,* 91 Fed. 587.) They should know of and give direction to the general affairs of the institution and its business policy, and have a general knowledge of the manner in which the business is conducted, the character of the investments and the employment of the resources. No custom or practice can make a directorship a mere position of honor void of responsibility, or cause a name to

become a substitute for care and attention. The personnel of a directorate may give confidence and attract custom; it must also afford protection." (*Kavanaugh* v. *Commonwealth Trust Co., supra,* pp. 105, 106.)

It is a corollary of the duty thus imposed that a director is chargeable with knowledge actually possessed or which he might have possessed had he diligently discharged his functions. Ignorance of the performance of illegal acts which is the result of inattention does not exculpate. (*Bowerman* v. *Hamner*, 250 U. S. 504, 513.) " Upon abundant authority, in *People* v. *Equitable Life Assurance Society* (124 App. Div. 714, 731), the same principle of imputed knowledge and responsibility for nonfeasance and acts suffered to be done because of inattention and lack of care, was applied by this court in a statutory action against directors for loss occurring through neglect of duty." (*Childs* v. *White*, 158 App. Div. 1, 4.)

With these general principles in mind, I advert to the liability of the individual directors named as defendants in this action. The directors other than Knott, Kadel and Aron were also executive officers or employees of General Surety Company and National American Company, Inc. None of these defendants testified at the trial and the record clearly establishes that they knew of, approved and consummated the transactions sued upon. In view of the determination of illegality and resultant loss heretofore made, their liability is conclusive.

The remaining defendants are not charged with active participation but with acquiescence and approval, with either actual or presumed knowledge of the illegal transactions. Ultimately, liability must rest upon directorship in General Surety Company at the time the transactions sued upon were consummated or approved. These defendants contend, *inter alia*, that they had ceased to be directors during the period in question.

The defendant Kadel became a director of General Surety Company in December, 1928. His tenure of office is disputed; the plaintiff asserts that he remained in office until March 9, 1932, and the defendant urges that his office was terminated on March 11, 1931, when he was re-elected a director at the annual meeting of stockholders. The fact of re-election is conceded and I conclude from the testimony that notice of such action was received by Kadel and that he thereafter did not tender his resignation or otherwise decline the office.

Formal re-election without proof of acceptance is not sufficient to establish directorship in a corporation. The controlling law is set forth in the leading case of *Cameron* v. *Seaman* (69 N. Y. 396, 398): " But the fact that he was elected a trustee did not alone

invest him with the character of trustee, so as to charge him with the duties and responsibilities of the office. There must in addition have been an acceptance on his part of the office to which he was elected. He was not bound to accept the position. He did not by becoming a stockholder in the corporation undertake to act as trustee if elected. It was not necessary that the defendant should by direct and positive act assent to the action of the stockholders. His acceptance could be shown by conduct on his part indicating an intention to accept the office, and might be implied from circumstances."

Thus the plaintiff need not prove express acceptance of the office; it is sufficient if the acceptance is implied from all the circumstances. Proof of election and *notification* thereof gives rise to a presumption of acceptance which is controlling in the absence of any conduct tending to indicate an intention to disclaim the office. (*Halpin* v. *Mutual Brewing Co.*, 20 App. Div. 583, 584; *Woodman* v. *Butterfield*, 116 Me. 241; 101 A. 25; Spellman, Corporate Directors, [1931] p. 293.) And this is more clearly evident upon notification of re-election. While the circumstance that the holder of the original term and the director-elect are identical may not affect the legal principles involved, it does color the factual picture and enhances the weight to be given to the failure to expressly disclaim or tender formal resignation. Kadel was a director and a member of the executive committee of National American Company (which owned over ninety-nine per cent of the stock of General Surety Company) from March 10, 1930, to the date of liquidation. His regular attendance at meetings of the board of directors of that company is highly significant; the asserted non-attendance at meetings of the directors of General Surety Company has no probative value in view of the fact that no such meetings were called during the period in question.

By force of the provisions of section 21 of the General Corporation Law, Kadel would have remained a director had there been no election on March 11, 1931. While the election of new directors on that date would have terminated the office of the old directors, it is illogical to conclude that the re-election of the same directors without proof of declination terminates a term of service which would otherwise have continued. There is nothing contained in the record to indicate that Kadel had not unqualifiedly accepted the office to which he was elected and accordingly he was both in law and fact a director until March 9, 1932.

The defendant Knott became a director of General Surety Company on October 10, 1927. He was president of the company from January 24, 1928, until January 15, 1930, when he was elected

chairman of the board of directors. He was also a director and the president of both National American Company, Inc., and State Title and Mortgage Company in 1930. By a series of resignations Knott severed his official connections with these companies. On October 15, 1930, he resigned as president of General Surety Company (apparently under a mistaken impression that he still held that office). On November 3, 1930, he resigned as president of National American Company, Inc., as president of State Title and Mortgage Company, and as chairman of the board of General Surety Company. On December 20, 1930, he tendered his resignation as director of National American Company, and on January 24, 1931, he resigned his directorships in State Title and Mortgage Company and General Surety Company.

The testimony and documentary proof compel the conclusion that Knott retained his office of director of General Surety Company until January 24, 1931. His resignation as officer did not relieve him of his obligations as director.

The defendant Aron is in a different position. He became a director originally on October 10, 1927, and continued in his office by virtue of re-election for a period of one year on March 12, 1930. However, on June 16, 1930, he formally tendered his resignation as a director " to take effect at the pleasure of the Board." At the same time he took similar action with respect to his affiliation with other companies in the National American group. These other resignations were accepted but apparently no formal action was taken by the board of General Surety Company. It further appears that prior to re-election Aron had sold his stock holdings in General Surety Company, and that subsequent to June 16, 1930, he received no notice of any meetings which were thereafter held. Under these circumstances, it is unnecessary to determine whether an acceptance resulted from the conduct of the company. (Cf. *Prudential Trust Company* v. *McCarter*, 271 Mass. 132, 156; 171 N. E. 42.) It is enough that no finding of negligence may be predicated on inattention to matters which subsequently transpired at meetings no notice of which was either sent or received by this defendant, at a time when a resignation had already been tendered.

The defendants Kadel and Knott also disclaim any liability on the ground of actual or presumed knowledge. It would serve no useful purpose to detail the proof which establishes the liability of both for the loss sustained on the purchase of National American stock and the liability of Kadel on account of the loan of the Realty Foundation bonds.

I am clear that these defendants either knew of the purchases of stock or that such knowledge of the affairs of the corporation is

imputable to them. A director " is chargeable with such knowledge as to its affairs as he actually possessed, or which in the discharge of his duties he should have had." (*Logan* v. *Fidelity-Phenix Fire Ins. Co.*, 161 App. Div. 404, 410; affd., 220 N. Y. 688.)

Nor is the manner of acquiring knowledge or the capacity in which approval was given of any legal significance. The conduct of Kadel as a director of National American Company, Inc., at a time when he was also a director of General Surety Company, is imputable to him in his latter capacity. A director is under a duty to act in the interests of the corporation at all times and he may not act contrary to its interests and avoid liability by a claim that such action was taken in some other fiduciary capacity. No meetings of the board of directors of General Surety Company were held since October 23, 1930. But National American Company, Inc., was the parent company of General Surety Company and the officers and directors of both corporations were substantially the same, and it appears that the business of General Surety Company was discussed at the meetings of the executive committee and board of directors of the parent company. The statutory prohibitions contained in section 16 of the Insurance Law are mandates to the directors of insurance companies, and under the situation presented by this record, Kadel is chargeable as a director of General Surety Company with his activities as a director of National American Company.

The measure of damages to be assessed against each defendant is the loss ultimately sustained by the corporation with interest from the date of the loss. The defendants are liable in varying amounts depending on their terms of office as directors, and there can be no dispute as to the exact amount of the individual judgments to be entered herein in the light of the determinations heretofore made.

Prior to the trial this action was settled as to a number of defendants with the approval of the court at Special Term. The defendants against whom judgments are entered are entitled to the benefits of these settlements. In equity, it would seem that the money paid by the defendants who have settled should be applied as against any loss now determined to have accrued prior to the date of their resignation as directors. The contention of the defendants with respect to the allocation of the amounts received in settlement is well founded and the judgments will be reduced accordingly.

Judgments directed in favor of the plaintiff in the amounts indicated herein.